**UNITED STATES, Appellee,**

v.

**Roderick L. TAYLOR, Defendant, Appellant.**

**No. 98–1536.**

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1998.

Decided Dec. 4, 1998.

---

John M. Thompson for appellant.

Ariane D. Vuono, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney and Dina Michael Chaitowitz were on brief for appellee.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge.

Taylor appeals from his conviction on one count of possession with intent to distribute cocaine pursuant to 21 U.S.C. § 841 and one count of using or carrying a firearm during and in relation to a drug trafficking crime pursuant to 18 U.S.C. § 924(c). Prior to trial, Taylor filed a motion to suppress drugs and firearms seized from the car he was driving on the ground that the initial stop of the car was not justified. The district court denied the motion. On appeal, Taylor challenges the denial of the motion to suppress. He also contends that the jury instructions pertaining to the firearms offense were erroneous. We affirm.

## I.

On February 1, 1996, at approximately 1:00 p.m., Officer Kevin Lee of the Springfield Police Department, while working his shift in the Narcotics Division, received a telephone call from a confidential informant. During the course of their conversation, which lasted approximately five minutes, the informant told Officer Lee that he had observed a brown Acura with tinted windows and Massachusetts registration number 977–YMS in the area of Cambridge Street in Springfield. The informant stated that the Acura was occupied by two black males, one approximately six feet seven inches tall and wearing a Dallas Cowboys jacket and the other approximately six feet tall with braided hair and wearing a black leather jacket. The informant also told Officer Lee that he had observed the two men in possession of a large quantity of crack cocaine and two nine millimeter handguns. He informed Officer Lee that the men were making "drops" (delivering narcotics to street-level dealers) in the Mason Square area of Springfield.

During the hearing on Taylor's motion to suppress, Officer Lee testified that it was standard procedure in the Narcotics Division of the Springfield Police Department to assign each informant to an individual officer for handling. This was done, according to Lee, in part to ensure that the identities of confidential informants remained secret. The informant who called Officer Lee on February 1, 1996 was assigned to Officer Talbot, another officer in the Narcotics Division who was not on duty that day. Although the informant was assigned to Officer Talbot, Officer Lee testified that he had worked personally with the informant for approximately one year prior to receiving the telephone call. He testified that he knew the informant by name and recognized his voice immediately. Officer Lee testified that he had worked with the informant on approximately five occasions prior to February 1, 1996. Officer Lee recalled that he had participated in "raids" and "lookouts" based upon information provided by the informant and that the informant had participated in controlled purchases of narcotics on behalf of the police. Officer Lee could not recall whether the information provided by the informant on these five prior occasions had led to any arrests or convictions. At the time he received the call, Officer Lee was aware, however, that on at least five occasions in the past the informant had provided Officer Talbot with information that led to arrests and convictions. Based upon his own experience and upon his knowledge of Officer Talbot's experience with the informant, Officer Lee characterized the informant as "one of the better informants that we have."

Immediately after his conversation with the informant, Officer Lee made a general radio broadcast to all Springfield police units. He told all units to be "on the lookout" for a brown Acura with tinted windows bearing Massachusetts registration number 977–YMS, last seen on Cambridge Street in Springfield. Officer Lee conveyed the description of the two occupants of the car that had been provided by the informant. He also alerted all units that the occupants of the Acura had two nine millimeter handguns and a large quantity of crack cocaine.

Approximately 45 minutes after Officer Lee's broadcast, Officer Komosa, a twenty-nine-year veteran of the Springfield Police Department who was on patrol in his marked police cruiser, saw a gold Acura parked at the curb in front of a variety store near the corner of State Street and Cortland Street. This location is in the Mason Square area of Springfield. Officer Komosa drove past the Acura and called the station to confirm the registration number. The car bore the same plate number as that broadcast by Officer Lee. Officer Komosa testified at the suppression hearing that he recalled Officer Lee's radio broadcast mentioning that this car was involved in the sale of narcotics and that the occupants were believed to have weapons. Officer Komosa further testified that when he first observed the Acura there appeared to be someone in the car and that, as he passed the car, it looked like there were people coming towards it from the store, and perhaps entering it.

After he received confirmation of the plate number, Officer Komosa requested backup from other officers in the area. The Acura pulled from the curb and began heading east on State Street. When the Acura reached a stop light at the corner of State Street and Benton Street (a location that is also in the Mason Square area of Springfield), Officer Komosa positioned his cruiser behind the Acura and activated his overhead lights. Officer Komosa instructed officers in two other police cruisers, which arrived at the intersection within seconds of Officer Komosa's request for backup, to converge on and block in the Acura. When the Acura was blocked in, Officer Komosa got out of his cruiser. He testified at the suppression hearing that he drew his weapon "knowing that there's guns involved in this particular thing." Officer Komosa commanded the driver of the Acura (later revealed to be Taylor) to shut off the car's engine. Using his door as cover, Officer Komosa waited as other officers approached the Acura. Officer Komosa could see through a small, un-tinted portion of the back window that there were two individuals in the front seat and at least one individual in the back seat of the Acura.[1] Because of the Acura's tinted windows, however, Officer Komosa could not positively match any of the car's occupants with the description provided by the informant, nor could he see what any of the individuals were doing inside the car.

Two officers in plain clothes, at least one of whom had his gun drawn, then approached the driver's side of the Acura. At the same time, other officers also approached the passenger's side of the Acura. As Officer Komosa watched, three occupants were removed from the Acura, placed on the ground, and pat-frisked for weapons. Once the occupants were secured by the other officers, Officer Komosa re-holstered his weapon. Officer Komosa testified that the occupants were on the ground for no longer than three to four minutes. Once they were frisked, the occupants of the car were taken toward the rear of the Acura and interviewed. At that point, none of the officers had their weapons drawn. The occupants were not placed in handcuffs and the record does not indicate that they were told at the time by any officer that they were not free to leave. Officer Komosa testified that in all, a total of ten to twelve officers, some in plain clothes and others in uniform, and a number of cruisers and unmarked vehicles ultimately responded to his request for backup. He testified that twenty-five to thirty minutes elapsed from the time he stopped the car to the time the occupants were placed under arrest and taken to the police station.

Officer Auger and Sergeant Kennedy arrived on the scene in separate vehicles approximately one minute after receiving Officer Komosa's request for backup. Officer Auger testified that there were between three and seven officers on the scene when he arrived. Upon his arrival, Officer Auger observed that the front passenger door of the Acura was open, and that all three individuals were outside the car and were being interviewed by officers near the rear of the Acura. Officer Auger went to the passenger side of the Acura and, after positioning his head and upper torso inside the passenger

---

[1] It was later determined that two of the occupants of the Acura matched the descriptions provided by the informant.

compartment, immediately detected a "strong odor" of marijuana. Officer Auger testified at the suppression hearing that he recalled that Officer Lee's broadcast had mentioned weapons, and that he was searching the passenger's side floor area for weapons. He testified that immediately after he looked at the floor area, he looked up into the area between the Acura's sunroof and its retractable sunscreen and observed a large, clear plastic bag containing seeds, stems and marijuana. Officer Auger retrieved these items. Officer Auger also retrieved from the sunroof compartment two more plastic bags containing crack cocaine (225 grams) packaged for street sale.

At the same time that Officer Auger was searching the passenger side of the Acura, Sergeant Kennedy was searching the driver's side for weapons that might have been accessible to the occupants of the Acura. When Sergeant Kennedy opened the driver's side door and entered the Acura, he too immediately identified a "strong smell of marijuana." Two to three minutes after they began searching the car for weapons, Sergeant Kennedy saw Officer Auger retrieve a large bag containing marijuana from the sunroof area. Sergeant Kennedy then looked into the driver's side area of the sunroof compartment and found a ski cap wrapped around a loaded .45 caliber automatic pistol with an extra ammunition clip. Sergeant Kennedy retrieved these items from the car. The occupants of the car were then arrested, placed in a police cruiser, and transported to the police station.

Taylor and a co-defendant were indicted in federal court on one count of possessing with intent to distribute cocaine base, in violation of 18 U.S.C. §§ 841 and 2, and one count of using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). Taylor filed a motion to suppress the marijuana, crack cocaine, loaded .45 caliber handgun and ammunition seized from the sunroof area of the Acura. The district court denied the motion to suppress. The court held that the initial stop of the Acura was justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that once the officers detect-

ed a "strong odor" of marijuana, the search of the sunroof was supported by probable cause. After a four-day jury trial, Taylor was found guilty on both counts of the indictment. He was sentenced to 120 months' imprisonment on Count One and 60 months' imprisonment on Count Two, to be served consecutively.

## II. *DISCUSSION*

### A. *The Motion to Suppress*

■ Taylor challenges the denial of his motion to suppress the evidence seized from the Acura. In assessing this claim, we review the district court's findings of fact for clear error, but we review *de novo* its conclusions of law and its ultimate ruling on the constitutionality of the government's conduct. *See United States v. Acosta–Colon,* 157 F.3d 9 (1st Cir.1998).

■ In *Terry v. Ohio,* the Supreme Court recognized that the police must be free to pursue what it termed a "legitimate investigative function." 392 U.S. at 21, 88 S.Ct. 1868. Hence "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* The *Terry* Court went on to hold that, in furtherance of such a legitimate investigation, the police may take reasonable steps to protect themselves by searching a suspect for weapons or taking other protective measures. *Id.* at 23–24, 88 S.Ct. 1868. In doing so, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Id.* at 27, 88 S.Ct. 1868. In subsequent cases, the Supreme Court has held that the police's investigatory powers include stopping motor vehicles upon reasonable suspicion; and that, when doing so, officers may take reasonable measures for their own safety, such as by disarming the suspect. *See, e.g., Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)(noting that "roadside encounters between police and suspects are especially

hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect").

■ Under the now familiar two-pronged inquiry, we must determine "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. To satisfy the first prong, " 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir.1994) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). To satisfy the second prong, we examine the totality of the circumstances, *see United States v. Cruz*, 156 F.3d 22, 26 (1st Cir.1998), bearing in mind that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties," *Terry*, 392 U.S. at 23, 88 S.Ct. 1868.

■ The initial stop in this case was based upon information provided by a confidential informant.[2] The district court found that the informant was reliable. We see no basis for rejecting that conclusion. Indeed, the court's finding is amply supported by the record. The informant had provided reliable information to the Springfield Police Department on several occasions in the past. Officer Lee was personally familiar with the informant. He recognized the informant's voice and knew him by name. At the time he received the telephone tip, Officer Lee was aware that the informant had provided reliable information to Officer Talbot and perhaps other officers that had led to several arrests and convictions. Officer Lee himself had worked closely with the informant on several occasions during the year preceding the telephone tip, participating with him in "raids," "lookouts," and controlled purchases. While Officer Lee could not recall whether arrests or convictions had followed these events, he believed the informant to be a reliable source of information. Indeed, Officer Lee testified that the informant was "one of the better informants that we have."

The Supreme Court has upheld *Terry* stops based upon information provided by informants, both known and unknown to the police. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), a person known to an officer approached the officer and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The officer approached the car, tapped on the window, and asked Williams to open the door. When Williams instead rolled down the window, the officer reached into the car and removed a loaded revolver from Williams' waistband. The gun had not been visible to the officer from outside the car, but it was located in precisely the place indicated by the informant. Williams was arrested for unlawful possession of the revolver. A subsequent search of the car revealed a large quantity of heroin. The Supreme Court held that the officer had acted justifiably in responding to the informant's unverified tip. The Court emphasized that the informant was known personally to the officer and "had provided him with information in the past." *Id.* at 146, 92 S.Ct. 1921.[3] The Court noted that

**2.** Taylor argues that the information concerning the informant's reliability known to Officer Lee cannot be imputed to Officer Komosa under the so-called "fellow officer" rule. We reject that contention. Officers Lee and Komosa were "cooperating in an investigation." *United States v. Meade*, 110 F.3d 190, 193 (1st Cir.1997). Accordingly, Officer Komosa was not required to undertake an independent assessment of the informant's reliability before acting upon the information provided to Officer Lee. Indeed, to require such an independent inquiry by an officer on patrol in the area of the suspected criminal activity would undermine the legitimate investigatory functions of the police and require an officer to "shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

**3.** The Court did not indicate whether the information provided by the informant on prior occasions led to any arrests or convictions. Accordingly, we disagree with Taylor's contention that since the information provided to Officer Lee on certain occasions in the past may not have resulted in arrest or conviction, the informant should be deemed unreliable. We are unaware of any authority to support that bald proposition, and Taylor has cited none. In any event, as of February 1, 1996, Officer Lee was aware of at least five occasions in which arrests or convictions had

informants' tips may vary greatly in their value and reliability, but went on to state that "when a credible informant warns of a specific impending crime . . . the subtleties of the hearsay rule should not thwart an appropriate police response." *Id.* at 147, 92 S.Ct. 1921.

In *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Court upheld a *Terry* stop of an automobile based upon an *anonymous* telephone tip. In *White*, the informant told police that an individual would be leaving a particular address at a particular time in a brown Plymouth station wagon with a broken right taillight. The informant further informed police that the individual would be traveling to Dobey's Motel, and that she would be in possession of an ounce of cocaine, which she would carry inside a brown attache case. Officers proceeded to the specified address, where they observed a brown Plymouth station wagon with a broken right taillight. The officers saw someone leave the building, carrying nothing in her hands, and enter the station wagon. They followed the car as it drove the most direct route to Dobey's Motel and stopped the car just before it reached the motel. A consensual search of the car revealed drugs. The Supreme Court held that the officers possessed reasonable suspicion to stop the car. The Court emphasized that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* at 330, 110 S.Ct. 2412. The Court noted that the officers corroborated the information provided by the tipster relating to the make of the car, the time the person would be leaving the building, and the person's destination. *Id.* at

331, 110 S.Ct. 2412. Although not every detail mentioned by the informant was verified,[4] the Court held that the anonymous tip had been sufficiently corroborated to furnish a reasonable suspicion of criminal activity.

■ Like *Adams*, this case involves a tip from a known informant, one who had provided reliable information to the police in the past. In *Adams*, the informant was not able to provide many details, while here the informant furnished specifics as to the make and color of the car, its registration number, a description of the occupants, and the neighborhood where they were making the drug drops. Although unable to see the occupants, Officer Komosa was able to confirm the other details before he stopped the Acura. Thus, as in *White*, there were aspects of the informant's tip that could be verified before the stop was actually made.[5]

■ The Supreme Court has "looked favorably upon a practical, commonsense approach to the issue of reasonable suspicion." *United States v. Sowers*, 136 F.3d 24, 28 (1st Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998). As the Supreme Court has said:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest simply to shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Here, the

resulted from information provided by the confidential informant.

4. The Court pointed out that the information regarding the person's name and the precise apartment from which she left were not verified by the officers. 496 U.S. at 331, 110 S.Ct. 2412.

5. Taylor urges us to conclude that the informant's tip was unreliable because, unlike the informant in *White*, the informant in this case did not predict what future actions the occupants of the vehicle would take. It is true that in addition to the aspects of the informant's tip that were corroborated, the Supreme Court found it "also important" that the tipster in *White* was able to

predict future actions. *Id.* at 332, 110 S.Ct. 2412. But the test to be applied looks to the "totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). As said, the informant in *White* was *anonymous*. Thus, more corroboration may have been required to support reasonable suspicion. As the Court held in *Adams*, even an unverified tip from a known, reliable informant may support an investigatory stop. Predictions of future activity, while a relevant aspect of the totality of the circumstances, are not required to uphold an investigatory stop based upon a tip from a known, reliable informant.

police were acting on a tip from a known reliable informant that the occupants of the Acura were making "drops" of narcotics in a particular area, and were in possession of weapons. "'A tipster need not deliver an ironclad case to the authorities on the proverbial silver platter. It suffices if ... a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them.'" *United States v. Diallo,* 29 F.3d 23, 26 (1st Cir.1994) (quoting *United States v. Chapdelaine,* 616 F.Supp. 522, 526 (D.R.I. 1985), *aff'd* 795 F.2d 75 (1st Cir.1986)). The Supreme Court in *White* credited the proposition that "because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." 496 U.S. at 331, 110 S.Ct. 2412 (citing *Illinois v. Gates,* 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Doing the same here, we conclude that under the totality of the circumstances the tip from a known, reliable informant, which was corroborated in significant aspects by Officer Komosa, exhibited sufficient indicia of reliability to justify the investigatory stop of Taylor's car. *See United States v. Alston,* 112 F.3d 32, 34 (1st Cir.) (upholding *Terry* stop based upon corroborated tip from confidential informant who had provided reliable information in the past that individual wearing certain clothing and located at certain address was carrying a gun), *cert. denied,* — U.S. —, 118 S.Ct. 568, — L.Ed.2d — (1997).

■ Determining that the stop was justified at the outset, while essential, is only the first step. We must also ascertain "whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. We have little trouble in concluding that the officers acted reasonably under the circumstances in this case.

■ Based upon Officer Lee's broadcast, Officer Komosa and the other officers who responded to his request for backup had reason to believe that the occupants of the Acura were armed drug dealers engaged, at that very time, in dropping off drugs. Possessed of such information, Officer Komosa, a twenty-nine-year veteran of the Springfield Police Department, was justified when approaching the suspects' car in drawing his weapon and ordering the driver to shut off the car's engine. Once the Acura was immobile, the officers properly removed the occupants and secured them so as to conduct a limited search of their persons for weapons. After the frisking, which lasted three or four minutes, the suspects were taken to the rear of the car where they were interviewed. Weapons were re-holstered by then and no handcuffs used. An officer is permitted to conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. As the *Terry* Court noted, "it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24, 88 S.Ct. 1868. The district court supportably found that "[a] more casual approach, given the information [the officers] had, would have been unprofessional and perhaps even foolhardy."

■ Directly after the pat-down search of Taylor, Officer Auger and Sergeant Kennedy arrived on the scene and looked in the car. They testified that they did so in order to search for any immediately available weapons. Where officers reasonably believe that a suspect is dangerous, they may search those areas of the car in which a weapon may be placed or hidden. *See Long,* 463 U.S. at 1049, 103 S.Ct. 3469. Thus, the officers were permitted to conduct a search of the passenger compartment of the automobile for any weapons that might have been accessible to the occupants. This limited search of the vehicle for weapons was permitted even though the occupants had been secured and taken to the rear of the Acura. *See id.* at 1051–52, 103 S.Ct. 3469 (holding that officers who searched passenger compartment of

stopped car for weapons acted reasonably even though suspect was under officers' control at time of search). When looking in, Officer Auger and Sergeant Kennedy immediately detected a "strong odor" of marijuana. That observation provided probable cause for a search of the car for any narcotics. *See United States v. Staula*, 80 F.3d 596, 602 (1st Cir.) ("The case law is consentient that when a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area."), *cert. denied*, — U.S. —, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996). In conducting their search based upon probable cause, the officers noticed in plain view in the sunroof compartment a bag containing marijuana and a .45 caliber weapon wrapped in a ski cap. Those items were properly seized.

■ Taylor argues, to the contrary, that what occurred when Officer Komosa stopped the Acura was a *de facto* arrest, requiring at the outset not just reasonable suspicion but probable cause, which he further declares was lacking. Taylor points to the following facts: (1) Officer Komosa and at least one other officer had their weapons drawn; (2) there were ten to twelve officers on the scene; (3) Taylor and the other occupants of the Acura were placed face-down on the ground and pat-frisked; (4) the egress of the Acura was blocked by police cruisers; and (5) the detention lasted approximately thirty minutes.

■ "There is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause—detentions that are sometimes called 'de facto arrests.'" *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994). For the reasons discussed, we believe that the actions of Officer Komosa and the other officers, when viewed in the totality of circumstances then confronting them, fit within the contours of a permissible *Terry* stop.

It is true that Officer Komosa and another officer drew their weapons when approaching the Acura after the stop was made. Two cruisers arriving on the scene blocked Taylor's vehicle. And thereafter the Acura's occupants were secured on the ground and searched for weapons. However, as said, the information in Officer Lee's broadcast concerning the presence of weapons and the illegal nature of the suspects' ongoing activities warranted Officer Komosa and his fellows in believing that the Acura's occupants were potentially very dangerous. Officer Komosa and the others were entitled "to take swift measures to discover the true facts and neutralize the threat of harm if it materialized." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. *See United States v. Trullo*, 809 F.2d 108, 113 (1st Cir.) (holding that police officer's use of drawn weapon did not convert investigative stop into arrest), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

We have previously held that nearly identical circumstances did not convert an otherwise justified investigatory stop into a *de facto* arrest requiring probable cause. As we said in *United States v. Jackson*, 918 F.2d 236 (1st Cir.1990):

> These police actions—blocking the Jackson vehicle and frisking Edwards—did not transcend an investigatory stop. The police may conduct an investigatory stop by blocking the egress of a vehicle in which the criminal suspect is riding, and may approach the vehicle with weapons at the ready on a reasonable suspicion that its occupants are armed.

*Id.* at 238 (citations omitted). *See also United States v. Quinn*, 815 F.2d 153, 156–58 (1st Cir.1987) (holding that no *de facto* arrest occurred where police cruisers blocked suspect's egress, five officers were present, and interrogation took 20–25 minutes).

Nor is there any indication that Taylor was detained for any longer period of time than was necessary to allow the officers to perform a careful check to satisfy themselves that there was no danger from accessible weapons and to "confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). This is not a case in which a

significant period of time elapsed between the initial stop of the car and the discovery of contraband. *Cf. Sowers*, 136 F.3d at 28 ("Even though at least thirty minutes elapsed between the time of the stop and the discovery of what appeared to be contraband, we see no basis for disrupting the district court's founded conclusion that no de facto arrest transpired."). Within only a few minutes of the stop of the Acura, officers approaching the car smelled marijuana, providing them with probable cause to search the interior of the vehicle. Thereafter, the officers were justified in detaining the occupants of the Acura in order to inventory the contraband, conduct any further interrogation of the occupants, and place them under arrest.

Under these circumstances, we cannot say that the district court erred in concluding that a reasonable person, standing in Taylor's shoes, would have understood, at the time, that he was being briefly detained for inquiry and investigation, not arrested. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Several aspects of the initial stop support the court's conclusion. First, at no time prior to the discovery of drugs and weapons was Taylor placed in handcuffs. Second, there is no evidence in the record that Taylor was treated harshly by the officers or physically handled beyond the limited pat-frisk officers conducted immediately after Taylor was removed from the car. Third, none of the officers communicated to Taylor that he was under arrest or that they wished to place him under arrest until after the contraband was seized. Fourth, at no time prior to the discovery of the cocaine, weapon, and ammunition was Taylor told that he was not free to leave. Fifth, all of the officers re-holstered their weapons immediately after the occupants of the Acura were taken from the car and secured. Finally, all of the events—including the search of the car and the interrogation of its occupants—took place on a public street.

The totality of the circumstances demonstrates that a valid *Terry* stop occurred. The district court did not err in denying Taylor's motion to suppress the evidence seized from the Acura.

### B. *The Section 924(c)(1) Instruction*

 Taylor also argues that the court's instructions to the jury with respect to the elements necessary to convict him for "carrying or use" of a firearm under 18 U.S.C. § 924(c)(1) [6] were erroneous. Taylor contends that the court's instructions were flawed because they authorized the jury to convict him based solely upon a finding that he "used" a firearm, and that the evidence was insufficient for the jury to find that Taylor "used" a firearm during and in relation to a drug trafficking crime. As Taylor did not object to the challenged instruction at trial, we review the court's instruction for plain error. *See United States v. Booth*, 111 F.3d 1, 2 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 204, 139 L.Ed.2d 140 (1997). "This standard requires not only that the error be plain ... but also that affirmance would result in a 'miscarriage of justice,' one that would jeopardize public confidence in the integrity of the judicial process." *United States v. Ramirez–Ferrer*, 82 F.3d 1149, 1152 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996).[7] The Supreme Court has said that plain error requires that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

The court's instructions indicated that two possible bases for conviction were presented to the jury. The first was "use" of a firearm,

---

**6.** Section 924(c)(1) states in relevant part:
Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

**7.** Taylor seeks to have us review his argument as one based upon the sufficiency of the evidence. His claim, however, is based upon alleged flaws in the language used by the court in the jury instruction. Thus, we review the instruction for plain error. *See Ramirez–Ferrer*, 82 F.3d at 1151.

which, as the court accurately instructed, required "active employment of the firearm." The second was "carrying" of a firearm, which the jury was only told required "more than mere momentar[]y possession" of the firearm.

 It is questionable whether the evidence here supported a "use" finding, since the defendant was not shown to have actively deployed a firearm. *See Bailey v. United States*, 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The evidence, however, fully supported a "carrying" finding. *See Muscarello v. United States*, ── U.S. ──, ──, 118 S.Ct. 1911, 1914, 141 L.Ed.2d 111 (1998) (phrase "carries a firearm" applies to person who knowingly possesses and conveys firearms in a vehicle). The undisputed evidence established that officers found a loaded .45 caliber weapon and 225 grams of cocaine just above Taylor's head in the Acura he was driving when Officer Komosa stopped the car. That evidence provided ample basis from which the jury could reasonably conclude that Taylor "carried" a firearm "in relation to" a drugtrafficking crime. *See id.* at ──, 118 S.Ct. at 1919 (holding that person who carries drugs and weapons in trunk of vehicle or carries a firearm in locked glove compartment of vehicle while transporting drugs "carries a firearm" within meaning of section 924(c)(1)).

To be sure, the "carrying" instruction was less than illuminating. But it is unclear how the reference to "possession" harmed the defendant, and we cannot see that the absence, otherwise, of a definition of "carrying" constituted plain error resulting in a "miscarriage of justice." *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (plain errors " 'seriously affect the fairness, integrity or public reputation of judicial proceedings' ") (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). At worst, the jury was left to wrestle with the meaning of "carrying" in a situation where all the evidence indicated that a firearm was being carried in relation to a drug crime. On the facts, it was most unlikely that any deficiency in the instructions "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770.

*Affirmed.*