**UNITED STATES,**

v.

**Brian MORONEY and John Burke, Defendants.**

**No. 01–CR–10375–MEL.**

United States District Court, D. Massachusetts.

Aug. 29, 2002.

Roger Witkin, Catherine K. Byrne, Federal Defender Office, Boston, MA, for John B Burke.

Scott P. Lopez, Boston, MA, for Brian Moroney.

John A. Capin, United States Attorney's Office, Boston, MA, for U.S.

### MEMORANDUM AND ORDER

LASKER, District Judge.

This case involves an anonymous tip and subsequent search and seizure of Brian Moroney and John Burke. The defendants move to suppress evidence obtained in connection with their arrests, arguing that their Fourth Amendments rights were violated. The court held an evidentiary hearing on this matter on June 11 and 12, 2002, and heard the testimony of law enforcement officers Jeffrey Gonsalves, Bruce Gates, John Guenard, Dennis Amaral, Joseph Perkins, John Nunes, and a Private Investigator, James McDonald. While their recollections and opinions differed in some respects, all of the witnesses testified credibly. Based on this testimony, the evidence at the hearing, and the Fourth Amendment jurisprudence, I find the following:

Around 3:20 p.m., on August 5, 2001, Massachusetts State Trooper Jeff Gon-

salves received an anonymous telephone tip at the Middleboro State Police barracks. The caller told Gonsalves that two men, supposedly wanted by the FBI, had left the caller's home in South Plymouth five minutes earlier, that the men were in a dark blue Chrysler LeBaron four-door car bearing Massachusetts Registration Number 937TTX and belonging to a woman named Tara Harris, that the individuals might be headed toward Route 495 and driving North, that the two individuals were white supremacists, that they were armed with a sawed off shotgun, a stun gun, ammunition and a knife, that the operator of the car [named "John,"] and that the passenger was known as "Hyper."

The Massachusetts Troopers did not have any previous knowledge of the caller, and no audio recordings of the telephone call exists. After the call, Gonsalves ran the license plate number in the Registry of Motor Vehicles database, and found that the license plate number was registered to a blue Chrysler LeBaron, belonging to Mary Hand, not Tara Harris as the caller had predicted. Then, Gonsalves contacted the state troopers on patrol and relayed the information received from the tipster.

Approximately twenty-five minutes later, around 3:55 p.m., the same anonymous caller telephoned again. This time he told Gonsalves that the two white males might be heading to the Middleboro Victory Supermarket to commit an armed robbery. The four o'clock shift commander, Lieutenant Bruce Gates informed the other officers on duty of the details of the two phone calls. He and several other officers then proceeded to the Victory Supermarket and surrounding area in search of the noted blue car occupied by John and Hyper.

Driving down Clark Street East of Middleboro, which is near the Victory Supermarket off Route 495, Gates searched for the blue car in the parking lots of the Exxon gas station, McDonald's and a Day's Inn hotel around 4:25 p.m. From his vantage point in the Day's Inn hotel parking lot Gates did not see the car. About five minutes later, however, Gates observed the Chrysler LeBaron described by the caller parked in McDonald's parking lot. Gates observed only one white male sitting motionless in the car, and he confirmed that the license plate number matched the number given by the caller. Gates immediately radioed for back-up.

Gates parked his police cruiser on Clark Street East in order to approach the vehicle, and about one minute later Guenard arrived on bike. Then, officers Amaral, Mills, Nunes, Plant and Detective Perkins stationed themselves about the area. Gates and Guenard stood about one hundred yards from the car, and Gates ordered that the officers "move in." Both Gates and Guenard had their guns drawn as they approached the vehicle. Guenard moved toward the passenger side of the car with his gun "at the ready" position and Gates moved toward the driver's side of the car with his gun drawn.

About twenty feet away from Moroney, Guenard paused and yelled something like, "Police. Passenger, let me see your hands." There was no immediate response, and Guenard raised his gun and repeated the phrase, until Moroney began to put his hands outside the open window of the car. At this time Gates stood directly in front of the driver's side window, which was also opened, and his gun pointed at Moroney too. The officers made two important observations at that time. First, Guenard noted that Moroney's left hand held something. He ordered Moroney to open his fist, and some pills fell to the pavement. Second, as Moroney leaned to put his hands out the window, Gates saw a bulge in Moroney's lap and yelled,

"he has a bulge," or, translated into layman's terms, he has a gun in his pants.

Amaral and Guenard pulled Moroney out of the vehicle, placed him face-down on the parking lot and handcuffed him behind his back. At this point, Moroney was not free to leave, and no reasonable person could have thought otherwise. Gates ran around the car, and asked Moroney whether he had a gun; Moroney responded affirmatively. Then the officers turned Moroney onto his back, pulled up his shirt and removed a sawed-off twelve gauge shotgun approximately 14–20 inches in length. During the course of these events, the officers never told Moroney that he was under arrest or that he was not free to leave; by their orders and conduct, however, the officers de facto arrested Moroney's person from the moment that they forced him out of the car.

Once the officers handcuffed Moroney they asked him where the driver of the car could be found. Eventually, Moroney told them that the "other guy" was in the bathroom at McDonald's. Officers Noones, Perkins, and Plante then entered McDonald's and within seconds stood outside the men's restroom shouting, "Middleboro Police Department. If you're in the bathroom come out with your hands in the air." After the officers repeated this order a few times, Burke came out. The officers instructed him to get down on the ground, and he complied. Although as Perkins handcuffed Burke he apologetically said, "if you're not the guy we're looking for, you're just being cuffed for our safety," Burke was not told he was under arrest.

While Burke lay handcuffed, some officers entered the men's room. Though no other persons were in the restroom, the officers found a jacket hanging on a stall door and a fanny pack and a set of keys on a window ledge. The officers searched the fanny pack and found a stun gun and a Constable Badge. Later, the officers tested the keys discovered in the bathroom in the ignition of the Chrysler LeBarron and confirmed that they matched.

*I.*

Moroney and Burke move to suppress all evidence found in relation to their arrests, on the grounds that the anonymous tip was not sufficient to establish probable cause to arrest and search them. They contend that officers violated their Fourth Amendment rights to be free from unreasonable searches and seizures, and accordingly, all physical evidence seized and statements made should be suppressed. The government asserts that the evidence at issue was discovered pursuant to a Terry search, not an arrest. Further, the government contends that the officers sufficiently corroborated the anonymous tip, and therefore their actions were warranted.

*A. Standing*

As a preliminary matter, the government argues that Burke did not possess a reasonable expectation of privacy in the car or in the McDonald's bathroom; therefore, he lacks standing to move to suppress the evidence at issue. The government points out that because Burke was not present when the officers searched and seized the automobile and its contents, and that he did not own the car, he has no standing to challenge the search and seizure. *See United States v. Soule,* 908 F.2d 1032, 1036 (1st Cir.1990).

Burke counters that as the driver of the car, which had not been reported stolen or missing, he enjoyed a reasonable expectation of privacy in the car. He underscores his prior control of the vehicle stressing that he had not abandoned the car, but rather, had "temporarily left the vehicle to relieve himself." Conceding that it is his

burden to establish standing, Burke argues that he meets the two-prong test: (1) he had a subjective expectation of privacy in the car, and (2) this expectation is one that society is prepared to recognize as subjectively reasonable. *See United States v. Muhammad,* 58 F.3d 353, 355 (8th Cir.1995).

■ A defendant charged with possession of contraband may claim the benefits of the exclusionary rule only if his own fourth amendment rights have been violated. Therefore, it must first be determined whether Burke had a reasonable expectation of privacy in the area searched or the items seized. *Rakas v. Illinois,* 439 U.S. 128, 140–50, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The First Circuit has held that the following factors are relevant to a privacy expectation: "legitimate presence in the area searched, possession or ownership of the area searched or the property seized, ability to control or exclude others' use of the property, and a subjective expectation of privacy." *United States v. Lochan,* 674 F.2d 960, 965 (1st Cir.1982) (defendant driving a car owned by passenger who had no luggage or other personal belongings stored in the trunk or behind the seat did not have a reasonable expectation of privacy in the automobile).

■ Applying the factors noted in *Lochan,* Burke has not met his burden of establishing a reasonable expectation of privacy in the car. It is true that the car was not reported stolen; however that fact alone does not overcome the multiple factors indicating that Burke did not have a reasonable expectation of privacy in the car: it did not belong to him, it was not registered to him, he was not present at the time it was searched, it was parked in a public parking lot. In *Lochan,* 674 F.2d 960, 964–65 (1st Cir.1982) the First Circuit held that Charles Lochan had no reasonable expectation of privacy in an automobile even though he was driving when

stopped by the police, the passenger was the owner of the car, possessed the vehicle registration in his pocket, and claimed he was on a long road trip. Certainly if the driver in *Lochan* had no reasonable expectation of privacy, Burke, whose major argument is that the car in question was not reported as stolen, also lacks standing to assert a privacy interest.

■ The government argues further that Burke abandoned the items found in the McDonald's bathroom, and therefore had no reasonable expectation in that property. *See California v. Hodari D.,* 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (person who abandoned property in response to lawful police conduct did not have a reasonable expectation of privacy in the abandoned items). Conceding that Burke might not have abandoned the fanny pack, keys, and jacket in the McDonald's restroom *but for* the officers' command to come out with his hands up, the government argues that Burke nevertheless abandoned the items before he was seized by the police.

In addition to abandonment, the government contends that the items found in the bathroom were subject to seizure under the "plain view" doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 449–503, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Horton v. California,* 496 U.S. 128, 138–141, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The government points out that because the officers—like the general male clientele at McDonald's—were free to enter the bathroom, and the evidence appeared to be related to conspiracy to rob the Victory Supermarket, the items found in plain view should not be excluded.

Burke responds that the proper test for determining whether the items found in the McDonald's bathroom were "abandoned" for fourth amendment purposes, is whether Burke voluntarily relinquished

ownership of the evidence. The decision to leave the items in the bathroom cannot be characterized as voluntary, according to Burke, because his conduct was merely compliance with lawful authority. Thus, Burke insists that he intended to return to the bathroom in order to reclaim his property and that he left the evidence found in the bathroom out of necessity not voluntarily.

A McDonald's restroom is not a private place, since clients of the restaurant often frequent the restroom and share the bathroom space with other clients, often strangers. It follows that there simply is no legitimate expectation of privacy in such a facility, (especially given that Burke left the items behind). Moreover, Burke abandoned the property in the public restroom, and he cannot claim that he enjoyed a reasonable expectation of privacy there. Accordingly, Burke may not invoke the exclusionary rule as to the evidence searched and seized in the bathroom and the car.

## II. The Seizure of Moroney

There is no doubt that Moroney was "seized" for Fourth Amendment purposes, but there is disagreement as to the legal significance of the seizure: did the officers "arrest" Moroney or merely "conduct an investigatory seizure."

In light of the circumstances surrounding his detention, Moroney insists that from the outset the officers conducted a de facto arrest. He asserts that no reasonable person would have believed that he was "free to leave" when two officers surrounded him with their guns out and ordered him to put his hands out of the car window. *See United States v. King,* 990 F.2d 1552, 1563 (10th Cir.1993) (brandishing of gun and encircling of suspect's car amounted to an arrest). The government characterizes the officers' conduct throughout as merely an "investigatory stop" falling within the limits of *Terry v. Ohio,* 392 U.S. 1 at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and it relies upon *United States v. Taylor,* 162 F.3d 12 (1st Cir.1998) to support its position.

■ I find that the officers initially conducted a valid Terry stop when approaching Moroney in the car, but upon seeing the bulge in his pants they arrested him. The line distinguishing an arrest from a Terry stop is sometimes fuzzy: the facts of each case determine on which side of the line a case will fall, and increasingly, the law appears to favor public safety over other concerns. In fact, a Court of Appeals of this Circuit has ruled that "there is no litmus-paper test however to determine whether any particular mode of detention amounted to a de facto arrest," and that "an investigatory stop constitutes a de facto arrest when a reasonable man in the suspect's position would have understood his situation in the circumstances ... to be tantamount to being under arrest." *United States v. Acosta–Colon,* 157 F.3d 9, 14 (1st Cir.1998). In *Acosta–Colon* the court determined that the thirty minute detention of an individual at an airport, who was handcuffed and confined to a small interrogation room, exceeded the limits of a lawful investigatory stop. *Acosta–Colon* at 15.

The same year the First Circuit upheld a Terry search made pursuant to a confidential informant's tip that occupants of a particular car were in possession of crack cocaine and handguns. Upon locating the car, an officer requested back up and at least ten officers participated in the stop, two officers had their guns drawn, each suspect was removed from the car, placed face down, pat frisked. *United States v. Taylor,* 162 F.3d 12 at 16 and 20 (1st Cir.1998). Considering the totality of the circumstances, the *Taylor* court deter-

mined that the officers had conducted a valid Terry stop.

■ In light of these decisions, the facts of this case lead me to conclude that at the onset the officers' conduct constituted a lawful investigation into a possible armed robbery. The officers knew that Moroney might possess a shotgun, and their request (or order) that Moroney place his hands outside the window were appropriately tailored to the circumstances of the stop. ("It would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Taylor*, 162 F.3d 12, 20 (1st Cir.1998)). Unlike the situation in *Acosta–Colon*, the events here occurred in a matter of seconds, not a half hour, and Moroney was not removed from the vehicle until after Gates' spotted the bulge in his pants which indicated that Moroney was armed. I therefore find that the officers initiated a lawful Terry search which evolved into a lawful arrest upon Gates' notice of the weapon in Moroney's pants.

*III. Reasonable Suspicion*

■ Finding that the officers initially conducted a *Terry* stop rather than an arrest does not complete the analysis. In order to pass constitutional muster, the officers must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *United States v. Taylor*, 162 F.3d 12, 18 (1st Cir.1998). Moreover, in cases such as this, where the officer's decision to "stop and frisk" an individual rests on an anonymous tip, the Supreme Court has held that the anonymous tip, through corroboration, must exhibit sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop. *See Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412,

110 L.Ed.2d 301 (1990). In short, anonymous tips, unlike those provided by known informants, standing alone do not satisfy the fourth amendment requirements.

Did the officers in this case sufficiently corroborate the information given to them from the anonymous caller? Moroney and the government each rely on a Supreme Court decision supporting his or its answer to that query: the government cites to *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and Moroney *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). These cases mark the line where an anonymous tip, through corroboration, becomes a constitutionally sufficient basis for a Terry stop and where the tip falls short. The facts of this case do not neatly fit into either corner.

In *White* the police received an anonymous tip asserting that a woman was carrying cocaine and that she would be leaving her apartment at a specific time, get in a particular car, and drive to a specific motel. 496 U.S. at 327, 110 S.Ct. 2412 (1990). The Supreme Court ruled that standing alone the tip did not justify a Terry stop; however, once the officers had confirmed the caller's predictions about the woman's movements, the suspicion became reasonable. *White* at 332, 110 S.Ct. 2412. In *J.L.* the police received an anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. The Supreme Court found that the tip lacked the minimal indicia of reliability that was present in the *White* case, and commented:

> The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about

the gun nor supplied the basis for believing he had inside information about J.L. If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line. *J.L.* at 1379.

In the case at hand, the government argues that the officers corroborated the anonymous tip, and points to the fact that the Chrysler LeBarron with the matching tags was found close to the Victory Supermarket in Middleboro just as the caller had predicted. Moroney on the other hand, contends that the officers failed to corroborate any details provided in the tip, noting that the only act of corroboration taken by the officers did not match the predictions of the caller because the car was not registered to Tara Harris, but instead, Mary Hand.

The tip in *White*, similar to the information given by the caller here, qualified as the minimal amount of predictability which legitimated the officers' investigatory "stop and frisk" of Moroney. Specifically, the caller described the car, the matching license registration, the vicinity of the likely area of travel and the defendants' intention to commit an armed robbery of the Victory Supermarket. Further, the automobile described by the tipper arrived within the target time frame, and was parked in the lot adjacent to the predicted Victory Supermarket. These corroborated facts, fortified the veracity and reliability of the anonymous caller's tip and provided "sufficient indicia of reliability" to warrant the investigatory stop. *See White*, 496 U.S. at 332, 110 S.Ct. 2412.

Accordingly, having made the above observations, Gates and Guenard's actions constituted a valid Terry "stop and frisk" conducted in an effort to ensure public safety. It was not until Gates observed the bulge that Moroney was de facto arrested, and at that point probable cause existed to justify arresting him.

## IV. Conclusion

For the reasons stated, the motions to suppress are DENIED.

It is so ordered.