*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0313P (6th Cir.)
File Name: 01a0313p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CHARLES NORTHROP,
  *Petitioner-Appellee,*

  *v.*

No. 99-2472

DAVID TRIPPETT, Warden,
  *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 98-10133—Victoria A. Roberts, District Judge.

Argued: April 25, 2001

Decided and Filed: September 7, 2001

Before: BOGGS and CLAY, Circuit Judges; GWIN,*
District Judge.

———————————

**COUNSEL**

**ARGUED:** Jeffrey W. Caminsky, COUNTY OF WAYNE
PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellant.
David A. Moran, STATE APPELLATE DEFENDER

———————————————

 *The Honorable James S. Gwin, United States District Judge for
the Northern District of Ohio, sitting by designation.

OFFICE, Detroit, Michigan, for Appellee.  **ON BRIEF:** Jeffrey W. Caminsky, COUNTY OF WAYNE PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellant. Ronald E. Steinberg, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee.

GWIN, D. J., delivered the opinion of the court, in which CLAY, J., joined.  BOGGS, J. (pp. 21-27), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

GWIN, District Judge.  In this case, Respondent-Warden David Trippett appeals the district court's grant of a writ of habeas corpus to Petitioner Charles Northrop pursuant to 28 U.S.C. § 2254.  In granting Northrop's petition, the district court found Northrop had been denied his Sixth Amendment right to the effective assistance of counsel.  Although for different reasons than those relied upon by the district court, we agree that Northrop did not receive effective assistance of counsel and thus **AFFIRM** the judgment of the district court.[1]

I

Petitioner Northrop seeks relief from his state conviction for possession of cocaine.  He says his conviction cannot stand because he did not receive the effective representation due him under the Sixth Amendment.[2]  In particular,

————————————

[1] At oral argument, counsel informed us that Petitioner Northrop is no longer in prison.  Because Northrop filed this petition while in prison, his recent release does not defeat our habeas jurisdiction. *Carafas v. Lavalee*, 391 U.S. 234, 239-40, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968).

[2] In his habeas petition, Northrop also asserts a double jeopardy claim under the Fifth Amendment.  He does not appeal the district court's rejection of this claim.

It appears to me that, in granting the writ, the court has filtered the factual record through the lens of the current assertions of the petitioner, and contradicted *Morrison's* and *Strickland's* Sixth Amendment jurisprudence, as well as the more recent teaching of *Williams v. Taylor* as to limits on our review of state judicial decisions.  Had either of my colleagues represented petitioner, he might well have succeeded in suppressing the evidence that led to his conviction.  Unfortunately for petitioner, we are not called upon to decide solely if there was error in what was done by Officers Collins and Jackson, Attorney Braverman, or even the Michigan judicial system, much less whether we could have done better.  Under AEDPA, the necessary inference of the court's opinion is that all reasonable courts would find Braverman "grossly incompetent" in believing his client's claim that he felt no compulsion to accede to the officers' requests.  This is a client who also obligingly volunteered the information that he had "bud" hidden in his sock, in response to a pro forma request about whether he had any drugs.  Whatever we may think about Mr. Braverman's overall legal acumen, he was certainly in the best position to assess Mr. Northrop's credibility when he described his encounter with the police.  I cannot find gross legal incompetence in these circumstances, and I certainly do not believe it was unreasonable that the Michigan courts failed to find it.

I therefore respectfully dissent.

Northrop told his attorney that he was asked to approach the officers, a conversation occurred between the officers, and that one of them asked Northrop to empty his pockets "if he would." Northrop said "sure" and did so. (*Ginther* Hr'g I, at 62-66, J.A. 280-84). Braverman made clear his "perspective at the time," the perspective from which we are to judge his conduct and choices. *Strickland*, 466 U.S. at 689. "Taking all the information I got into consideration, including the way Mr. [Northrop] relayed the way this happened, I did not feel Mr. [Northrop] was doing anything involuntarily. That was the way I perceived it." (*Ginther* Hr'g I, at 65, J.A. 283). A more aggressive, insightful, or devious attorney might not have been so quick to equate his client's characterization of "voluntariness" with the legal definition. Nevertheless, it is within the minimum range of competence to perceive a claim as weak, when that claim is based on compulsion, and your own client indicates that he acted freely.

The court treats as patently obvious the presence of an involuntary detention prior to Northrop's admission of marijuana possession, stating "[t]here is no question that Jackson and Collins detained Northrop." *Supra* at 10. Even with the benefit of ten years' hindsight, I do not think there is "no question" about this, as I have discussed. Certainly, Braverman did not perceive that there was "no question" about the matter, primarily because in 1990 *Northrop did not believe he had been detained during his initial questioning*. Braverman could not rely on Mr. Northrop as his expert on the Fourth Amendment, but he necessarily relied on him as to Northrop's own state of mind and as to the coerciveness of the officers' conduct. Because Braverman believed that a *Terry* stop had not occurred,[3] and it is not unreasonable to find his belief within the range of professional competence, his failure to file a suppression motion cannot meet the standard of constitutional ineffectiveness required on federal habeas, and Northrop's Sixth Amendment claim must fail.

---

[3]This makes it irrelevant whether Braverman should have recognized there was an insufficient basis for a *Terry* stop.

Northrop says his trial counsel should have moved to suppress the cocaine evidence offered against him at trial.

On August 29, 1990, an anonymous caller informed the Detroit Police Department that two black males, one wearing a green "Used" jeans outfit, were selling drugs at the Greyhound Bus Station in Detroit. The caller provided no other information.

That same day, Detroit Police Officers Robert Jackson and Oliver Collins received a radio call relaying the anonymous tip. Minutes later, the uninformed officers arrived at the bus station, where they observed two black males sitting and talking. One of the males wore an outfit matching the description included in the tip. The other male was Charles Northrop.

As the officers approached, Northrop took a duffel bag off his shoulder and placed it under his seat. He then rose from his seat and attempted to walk past the officers. Before he could do so, Collins stopped Northrop.

Collins and Jackson both asked Northrop for identification. Collins next asked Northrop to empty his pockets. Northrop complied. After finding no contraband in Northrop's pockets, Collins asked Northrop if he had any drugs on his person. In response, Northrop admitted that he had marijuana in his sock. Collins then arrested Northrop for violating a municipal marijuana ordinance.

After arresting Northrop, Collins seized the duffel bag that Northrop had placed under his seat just moments before. A search of the bag revealed a large quantity of cocaine.

Michigan charged Northrop with possession of a controlled substance. On November 29, 1990, after a bench trial in the Wayne County Circuit Court, Northrop was convicted of possessing between 50 and 225 grams of cocaine. The trial court sentenced Northrop to eight to twenty years in prison. Attorney Eric Braverman represented Northrop through the trial.

Northrop appealed his conviction, raising the Sixth Amendment claim he now advances in support of his habeas petition. The Michigan Court of Appeals rejected the claim. The Michigan Supreme Court denied Northrop's leave for a second appeal.

After unsuccessfully appealing his conviction, Northrop filed a petition for a writ of habeas corpus with the United States District Court for the Eastern District of Michigan. On November 16, 1998, the district court granted the writ.

Respondent-Warden David Trippett now appeals the district court's ruling.

## II

We review the district court's decision to grant or deny a writ of habeas corpus de novo. *Barker v. Yukins,* 199 F.3d 867, 870 (6th Cir. 1999). In so doing, we consider the substantive standards governing the review of state court decisions challenged in a federal habeas petition. *Id.* at 871.

Because Northrop filed his petition after 1994, the Antiterrorism and Effective Death Penalty Act ("AEDPA") sets the standard for federal habeas review under 28 U.S.C. § 2254. The AEDPA amended the standard of review set forth in 28 U.S.C. § 2254(d) to provide:

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of the state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

of evaluating compliance with the Sixth Amendment, we are forbidden in the strongest terms from second-guessing counsel's conduct based on what has been discovered by more than a decade of further proceedings. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

In the ineffectiveness hearing afforded Northrop by Michigan, Braverman testified to what he was told about Northrop's "attempt to leave." Braverman believed Northrop had been asked to come over and speak to the officer, and that his movement was prompted by what "looks like a request and taken in connection with my conversation with Mr. [Northrop], it appeared like a request." (*Ginther* Hr'g I, at 38, J.A. 256). Northrop never told Braverman that he had been trying to leave and had been stopped by the police. The court cannot rely on Northrop's being stopped when evaluating Braverman's performance. It is not a fact we "know" today, and even less a fact that Braverman was privy to when deciding whether to make a suppression motion.[2]

---

[2] As to the initial questioning, the state court, after the *Ginther* hearing, has spoken to these matters. The Michigan trial court emphatically stated "that Mr. Braverman understood . . . , through his interview with Mr. [Northrop,] that Mr. [Northrop] voluntarily emptied his pockets, advised that he [had] bud in his sock and the like. That's my finding." (*Ginther* Hr'g V, at 23, J.A. 523). AEDPA demands that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254 (e)(1). The court apparently agrees that we must deem Northrop to have told Braverman that his responses to the police were voluntary, but it then imposes a *unarguable, constitutional* duty for counsel to disbelieve his client and pursue claims inconsistent with his client's statements. Otherwise, apparently, he is "not acting as counsel" under *Strickland.* The court's holding comes close to mandating that a Fourth Amendment challenge be part of every criminal proceeding where there evidence to be suppressed, something that goes well beyond what the Sixth Amendment requires, and which cannot serve the ends of the judicial system or provide the appropriate latitude to defense counsel.

current one, we stated that "officers did not engage in any overbearing or coercive activity in making these requests and that a consensual encounter occurred. We find that there is nothing to indicate that the officers conveyed a message that compliance with their request to speak with defendant and examine his ticket was required, and no *Terry* stop occurred." *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999); *see also United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991) ("We hold that because the defendant voluntarily gave the ticket to the officer, and the officer did not refuse to return the ticket to the defendant, taking the ticket did not constitute a seizure.").

The question then becomes what evidence exists or existed that the officers' statements conveyed the message that Northrop's compliance was required. There is and was none. Officer Jackson equivocated about whether he *would have done* anything had Northrop refused to comply. Compare Jackson's statement that he would have done "probably nothing," (*Ginther* Hr'g III, at 30, J.A. 425), with his statement quoted by the majority, *supra* at 12 n.7, saying he would not have let Northrop walk away during his investigation. Of course, no one – even Officer Jackson – knows what he would have done, and it is an issue of only peripheral importance. What the record discloses the officers *did* do is to explain that they had received a tip, ask some questions, and request that Northrop, "if he would," empty his pockets. Depending on the way the officers behaved, this might constitute a *Terry* stop, but it might not, and Northrop evidently led Braverman to believe that it did not.

Even were there sufficient record evidence to support finding a *Terry* violation, we are not asked to adjudicate whether, in a counterfactual universe, a successful suppression motion could have been made by Northrop in 1990. Northrop's petition is based on the supposed utter failure of Braverman to litigate an obvious and decisive Fourth Amendment claim. But based on what Northrop told Braverman about his encounter, Braverman had no reason to believe that a *Terry* claim would be successful. For purposes

The United States Supreme Court recently interpreted this statute, specifically addressing the distinction between decisions "contrary to" and involving an "unreasonable application" of clearly established federal law. *Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The Court explained that a state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13.

In contrast, a state court decision involves an unreasonable application of clearly established federal law only where the state court's application of such law was "objectively unreasonable." *Id.* at 409. A federal habeas court may not find a state adjudication unreasonable "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. "Rather, that application must also be unreasonable." *Id.*

The district court below reviewed Northrop's habeas petition upon the record developed at the state court. The district court conducted no evidentiary hearing. When a district court decides a habeas petition without evidentiary hearing, we review that district court's factual findings *de novo*. *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000) ("Any findings of fact made by the district court are normally reviewed only for clear error, but when the district court's decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes `no credibility determination or other apparent finding of fact,' the district court's factual findings are reviewed *de novo*")(citations omitted.); *Moore v. Carlton*, 74 F.3d 689, 691 (6th Cir. 1996) ("The district court made no credibility determination or other apparent finding of fact; its decision was based upon the transcript of Moore's trial. As such, it is reviewed *de novo*."). We therefore review the district court's factual findings *de novo*.

### III

In his petition, Northrop says his trial counsel, Eric Braverman, made errors so serious that he ceased to function as the counsel guaranteed under the Sixth Amendment.[3] U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assignment of Counsel for his defence."). He insists Braverman incompetently failed to move for the suppression of the cocaine evidence used against him at trial. According to Northrop, the police discovered this cocaine during an unlawful seizure and search.

The Fourth Amendment prohibits "unreasonable searches and seizures."[4] U.S. Const. amend. IV. Evidence recovered from an illegal search is inadmissible. *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346, 58 L. Ed. 652 (1914). Further, evidence recovered indirectly from an illegal search or seizure is also inadmissible as "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); *Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392-93; 40 S. Ct. 182, 64 L. Ed. 319 (1920).

But a defendant must seek the exclusion of such evidence at trial or on direct appeal. Because questions regarding the admissibility of otherwise relevant evidence seldom touch upon the "basic justice" of a conviction, the Supreme Court bars Fourth Amendment claims from habeas review. *Kuhlmann v. Wilson,* 477 U.S. 436, 447, 106 S. Ct. 2616, 91

---

[3] The Sixth Amendment applies to the States through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342-45, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

[4] Like the Sixth Amendment, the Fourth Amendment applies to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

of the district court's opinion would view it as choosing between alternate accounts of the incident contained in the record and making not only an "apparent finding of fact" (as discussed in *Moore* and *Wolfe*, *supra* at 5), but an actual finding, that the officers called to Northrop and that he stood up and came over to see what they wanted. We review the district court's factual findings on habeas only for clear error, *DeLisle v. Rivers*, 161 F.3d 370, 380 (6th Cir. 1998) (en banc), and the majority has not found the district court's account, which omits any mention of Northrop's seeking to leave, to be clearly erroneous.

Although concluding that a *Terry* stop had occurred – a legal conclusion to which no deference is due – the district court also made no finding that the officers had compelled Northrop to empty his pockets, and no findings about the officers' tone, manner, or show of force. We cannot assume compulsion *per se. Florida v. Bostick* held that no "seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage – as long as the officers do not convey a message that compliance with their requests is required." 501 U.S. 429 (1991) (citation and internal quotation marks omitted). In a case factually similar to the

---

Northrip [sic] didn't have this bag *when he came over to you*, right?
A   "When Mr. Northrip [sic] *got up with my partner*, that's when I saw him . . . kick it under the seat. (Trial Tr. at 24, J.A. 59) (emphasis added).

This is completely inconsistent with Northrop attempting to slip away prior to any interview. Officer Jackson was apparently confused three years later, as comparison of the conflicting testimony shows, over which of the partners had done what to which of the two suspects, and his testimony does not appear to have formed the basis of any previous adjudication. I see no reason for the court now to pick from the record this version of the facts, even if it had the power to do so – exactly what occurred at the Greyhound station is uncertain and perhaps unanswerable. Fortunately, the answer does not matter, because *the only relevant question is Braverman's knowledge in 1990*, and even new information perhaps given by Officer Jackson in 1993 cannot affect this determination.

liberty of the citizen.  Two instances of coercion are adduced to support the finding that  Northrop was seized.  Primarily, the court relies on Northrop's being stopped as he "sought to leave the area." *Supra*, at 10.  Secondarily, it relies on the supposed compulsion placed on Northrop to empty his pockets and produce his identification. The record is at best ambiguous as to both of these "events," however, and insufficient for us to alter the contrary factual findings of the district court and the state courts.

Although *Mr. Northrop*, on appeal, claims to have been restrained from leaving during his initial stop by Officers Jackson and Collins, *the district court made no such finding*. The district court describes the initial encounter thus:

> "Officer Oliver Collins testified at petitioner's trial that Petitioner was carrying a brown bag on his arm when the officer approached him. After Officer Collins and his partner asked Petitioner to approach them for questioning, Petitioner slipped the bag off his arm and kicked it under the seat.  The questioning occurred ten to thirty feet away from where the bag was located under the seat."

 (Dist. Ct. Op., at 12).  The district court's opinion (and the evidence presented at Northrop's trial) provide no support for Northrop's current claim that he was restrained from leaving the bus station when he stood up from his chair and answered the summons of the officers.[1]  Any reasonable interpretation

---

[1]This should not be misconstrued as a claim that there is no support *anywhere* for petitioner. Officer Jackson's testimony at the *Ginther* hearing three years after the incident, although relied upon by the court, was contradicted not only by Braverman's recollection of what Northrop told him about the incident, but also by Officer Collins's testimony at Northrop's trial, a few months after the arrest. Collins said repeatedly that his partner was initially talking to Northrop while Northrop was "sitting there," (Trial Tr. at 19, J.A. 54), and that his partner "brought him over to me," (Trial Tr. at 22, J.A. 57), after Collins's discussion with Northrop's compatriot.

Q  (By Mr. Braverman, continuing): "Okay. Now, Mr.

L. Ed. 2d 364 (1986); *Stone v. Powell*, 428 U.S. 465, 494-95, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976).

However, a habeas petitioner may assert a Sixth Amendment claim based on his counsel's failure to move for the suppression of evidence that should be excluded  under the Fourth Amendment. *Kimmelman v. Morrison*, 477 U.S. 365, 382-83, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).  To establish a Sixth Amendment claim, the petitioner must show his counsel performed deficiently and that the deficient performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Here, Northrop says Braverman's performance was both deficient and prejudicial.  Northrop argues that Braverman performed deficiently by not seeking suppression of the cocaine evidence.  He says the Fourth Amendment provided two grounds for excluding the cocaine.  First, Northrop says the officers illegally searched the duffel bag, thus rendering the cocaine they discovered in the bag inadmissible. Second, Northrop contends that the officers illegally seized him in the bus station.  Had the officers not done so, Northrop submits they never would have discovered the cocaine in the duffel bag.   The cocaine, according to Northrop, was thus inadmissible as fruit of the illegal seizure.

And Northrop insists Braverman's deficient performance resulted in prejudice.   If Braverman had moved for suppression, Northrop says the trial court would have excluded the cocaine evidence and acquitted him of cocaine possession.

Northrop raised this Sixth Amendment claim on direct appeal.  In denying the claim, the Michigan Court of Appeals found that Braverman made an acceptable strategic decision in choosing not to seek suppression of the cocaine evidence:

> This Court is convinced that defendant was not denied his constitutional right to effective assistance of counsel as it is apparent from the proceedings that defense counsel considered motions to suppress evidence, but

was convinced, after his conversations with defendant and other investigation, that such motions would not be granted, and that the most effective trial tactic was to make the defense that the luggage was not that of the defendant.

In granting Northrop's petition, the district court held that this ruling fell "outside the universe of plausible, credible outcomes." The district court found no reasonable basis for excusing Braverman's failure to move for suppression of the cocaine evidence. According to the district court, the cocaine was subject to suppression because the officers discovered it while performing an invalid search incident to arrest.

We disagree. Although, as explained below, we affirm the district court's grant of habeas relief on other grounds, we find the district court erred in ruling the officers' search unconstitutional.

Under the Fourth Amendment, a search absent a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). One such exception is for searches incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).

When conducting a search incident to arrest, police may search items within the "immediate control" of the person arrested. *Id.* at 763. The Supreme Court has construed the area within a person's immediate control to include the "area from within which he might gain possession of a weapon or destructible evidence." *Id.*

However, the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had the item within his immediate control near the time of his arrest, the item remains subject to a search incident to arrest. *New York v. Belton,* 453 U.S. 454, 461-62 n.5, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (upholding search of jacket

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting. I fully concur with the court's conclusion that the bag was searched lawfully incident to arrest, and with the rejection of the district court's basis for finding a violation of the Sixth Amendment. However, I consider as wholly inadequate the court's alternative basis for finding ineffectiveness of counsel.

In affirming the writ in this case, the court does not respect the high bar that has been set for claims such as Northrop's. In order for us to affirm the grant of the writ, we must not only find attorney Braverman to have acted incompetently *based on the information he had at the time*, we must find the opposing interpretation under *Strickland*, which accords wide deference and a presumption of competence to trial counsel, to be so far-fetched that no reasonable court could credit it. *See Williams v. Taylor*, 529 U.S. 362, 411 (2000). Even prior to AEDPA, the existence of a valid Fourth Amendment claim not raised at trial was insufficient for federal habeas relief. *See Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ . . . ." *Ibid*. The provisions of AEDPA requiring unreasonableness of a state decision, cited by the court in its initial discussion, *supra* at 5, but applied only in a conclusory manner to the decision of the Michigan Court of Appeals, *People v. Northrop*, 541 N.W. 2d 275, 277 (Mich. Ct. App. 1995), place an even heavier burden on the petitioner than the one imposed by *Morrison*.

Taking the facts as they have been presented to us, Northrop cannot take the first step toward meeting his burden, because he does not even have a valid Fourth Amendment claim based on his initial encounter with the police. A *Terry* stop, as noted by the court, requires coercion that restrains the

that *Strickland*'s prejudice test still applies to habeas petitions. *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000).

The fairness analysis discussed in *Lockhart* supplants the *Strickland* analysis in only very limited circumstances. For example, though a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix v. Whiteside*, 475 U.S. 157, 175-76, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986). To similar effect, in *Lockhart,* the Court decided that the likelihood of a different outcome attributable to an incorrect interpretation of the law was a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by *Strickland. Lockhart*, 506 U.S. at 369-70.

In this case, we find no reason to set aside the standard set forth in *Strickland* and *Morrison* for determining whether counsel's deficient performance caused prejudice. Because Braverman's performance was prejudicial under this standard, we find merit in Northrop's Sixth Amendment claim.

In finding otherwise, the Michigan Court of Appeals unreasonably applied clearly established federal law. That court decided Braverman's decision not to seek suppression of the cocaine evidence fell within the bounds of sound trial strategy. Although we recognize that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, we can think of no possible strategic merit in neglecting to seek the suppression of damning evidence discovered after a stop based solely upon an anonymous tip lacking predictive detail.

## IV. Conclusion

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

located in vehicle where defendant sat just prior to his arrest); *United States v. Nelson,* 102 F.3d 1344, 1347 (4th Cir. 1996) (upholding search of the defendant's shoulder bag after agents had removed it from him and taken him to another room for questioning); *United States v. Mitchell,* 64 F.3d 1105, 1110-11 (7th Cir. 1995) (upholding search of item after defendant was handcuffed).

Here, Northrop had the duffle bag on his shoulder as Jackson and Collins approached. Observing them coming toward him, Northrop removed the bag from his shoulder and placed it at his feet. Collins stopped Northrop near the bag. Collins then placed Northrop under arrest at this same location. The bag was searched almost immediately.

Under these circumstances, Jackson and Collins lawfully searched the duffel bag incident to Northrop's arrest. Thus, the Michigan Court of Appeals properly found that Braverman did not perform ineffectively in failing to challenge the search.

But we nevertheless find that the Michigan Court of Appeals unreasonably applied clearly established federal law in denying Northrop's Sixth Amendment claim.[5] Jackson and Collins lacked sufficient basis for stopping Northrop. Braverman should thus have sought to suppress the cocaine evidence. His failure to do so prejudiced Northrop.

The Fourth Amendment limits police officers' authority to detain individuals. U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . shall not be violated."). Specifically, an

---

[5]In this petition, Northrop does not challenge the Michigan Court of Appeals' articulation of the legal principles applicable to his Sixth Amendment claim. Instead, Northrop insists the court misapplied those legal principles in denying his claim. Accordingly, we decide whether the Michigan Court of Appeals unreasonably applied controlling precedent in finding Northrop had failed to show Braverman performed ineffectively.

officer cannot arrest an individual absent probable cause, i.e., a "fair probability" that the individual has either committed or intends to commit a crime. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Further, an officer cannot even briefly detain an individual unless the officer reasonably suspects the individual has been involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

There is no question that Jackson and Collins detained Northrop. Although not immediately arrested, Northrop was subjected to the type of brief investigatory stop described in *Terry*.

In *Terry*, the Supreme Court explained that an investigatory stop occurs when police use some form of coercion: "Obviously, not all personal intercourse between policemen and citizens involve seizures of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Id.* at 19 n.16 (internal quotations omitted). The test is whether, considering all of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.*

Here, a reasonable person in Northrop's position would not have felt free to terminate the encounter with Jackson and Collins. Northrop sought to leave the area before Jackson directed Collins to stop him. Jackson has testified that he would not have let Northrop walk away "during my investigation of him. . . ."[6] And the officers gave Northrop a clear indication that he was not free to leave by asking him to

---

[6] Jackson testified at the trial court's hearing on Northrop's ineffective assistance of counsel claim. *People v. Ginther*, 212 N.W.2d 922, 924 (Mich. 1973) (establishing state court proceeding for claims of ineffective assistance of counsel).

In support of this argument, Respondent relies on the Supreme Court's opinion in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). In that case, the Court found trial counsel's failure to object that an aggravating factor in a death penalty case unconstitutionally duplicated an element of the underlying felony-murder charge did not constitute the "prejudice" required to show ineffective assistance of counsel. Rather than focusing on whether the ultimate outcome might have changed, *Lockhart* said habeas courts should focus on whether any error of trial counsel rendered the trial unreliable or proceeding unfair:

> Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Id.* at 369-70; *see also Holman v Page,* 95 F.3d 481, 490 (7th Cir. 1996) ("[I]n the context of an ineffective assistance claim, 'a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. There must be more. Something must call into question the validity or fairness of the trial.'") (quoting *Morrison*, 477 U.S. at 382).

However, the Supreme Court has recently made clear that the outcome-determinative test set forth in *Strickland* generally determines whether trial counsel's performance prejudiced a habeas petitioner. *Williams*, 529 U.S. at 390-91 ("Cases such as . . . *Lockhart* . . . do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him."); *Glover v. United States*, 531 U.S. 198, 121 S. Ct. 696, 700, 148 L. Ed. 2d 604 (2001) ("The Court explained last Term that our holding in *Lockhart* did not supplant the *Strickland* analysis."). Likewise, this court has recognized

Northrop's seizure reasonable. During his representation, Braverman knew that police had arguably seized Northrop based upon no more than an  anonymous tip without any supporting verifiable detail.  Against this, the filing of a motion to suppress had no accompanying tactical cost.  A reasonable attorney would have tested Officers Collins and Jackson's stop.

Having found Braverman's representation deficient, we next address whether Braverman's performance prejudiced Northrop.  To establish prejudice, Northrop must show a reasonable probability that, "but for counsel's unprofessional conduct, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Specifically, "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Morrison*, 477 U.S. at 375.

We have already found that Northrop's Fourth Amendment claim had merit.  Thus, we need only decide if the verdict at Northrop's trial "would have been different absent the excludable evidence. . . ." *Id.*

Michigan convicted Northrop of cocaine possession.  Without the inadmissible cocaine evidence, Michigan would obviously have failed to meet its burden of proving Northrop possessed cocaine. Thus, Braverman's failure to move for the suppression of the cocaine evidence prejudiced Northrop.

But Respondent-Warden Trippett says Northrop must show more to establish prejudice.  Respondent says Braverman's representation prejudiced Northrop only if it deprived him of a fair or reliable trial.  Because the suppression of otherwise admissible evidence does not enhance the reliability of a verdict, Respondent says Braverman's failure to file a suppression motion could not have prejudiced Northrop.

produce identification and then empty his pockets. [7] The

---

[7]The dissent challenges this and argues that the Michigan Courts could reasonably find that no law enforcement officer restrained Northrop.  Contrary to the dissent's assertion, the record supports Northrop's claim that Officer Collins stopped Northrop after Northrop attempted to exit the bus station as Officers Collins and Jackson approached.  The dissent is also wrong in suggesting that Northrop approached the Officers at the Officer's request.

At the *Ginther* hearing, Officer Jackson testified:

Q.    You didn't talk to Mr. Northrop while he was seated?

A.    No.

*   *   *

Q.    How did Mr. Northrop get out of his seat?

A.    He stood up.

Q.    Without you or your partner asking him or telling him to stand up?

A.    Correct.

Q.    So, at this point prior to Mr. Northrop just standing up up on his own, you and your partner had not conducted any personal surveillance to determine if there were any narcotic selling or any such activity being conducted by Mr. Northrop or this other gentleman in the green Used outfit, had you?

A.    No.

Q.     So, after Mr. Northrop stood up, did he proceed to walk anywhere?

A.    Yes.

Q.    Where did he proceed to walk to?

A.    Walk towards myself and the way myself and Mr. [Officer] Collins had came in.

Q.    Had you said anything to Mr. Northrop, you

evidence before the Michigan Courts and the district court do not support the dissent's assertion that "Collins said repeatedly that his partner was initially talking to Northrop while Northrop was 'sitting there.'"  Infra at _____.[8]

---

Q.   or your partner at this point?

A.   No.

Q.   Had – strike that.  So, did Mr. Northrop walk past you and your partner?

A.   No.

Q.   Did anyone stop Mr. Northrop from walking past you and your partner?

A.   Yes.  I advised my partner to stop Mr. Northrop.

Q.   You told Officer Collins to stop him?

A.   Yes.

Q.   Did Officer Collins do that.

A.   Yes.

Q.   Otherwise, Mr. Northrop would have kept on walking?

A.   I assume so, yes.

*Ginther* Hearing III at 9-11, Joint Appendix at 404-06. *See also*, *Ginther* Hearing III at 32-33, Joint Appendix at 427-28.  (Officer Jackson testifying that he "wouldn't have let him leave until you were satisfied your investigation had been concluded.")

[8]At the Waiver trial, only Officer Collins gave substantive testimony about the stop.  Officer Jackson did not.  In his trial testimony, Officer Collins did make a general reference that: "when we asked Mr. Northrop to come here to question him he had, I observed him slip the bag off his arm and place it up under the seat."  But follow up trial testimony shows that Officer Collins did not observe his partner, Officer Jackson's, initial contact with Northrop:

Q.   And you were, you and your partner were

---

And *Braverman* should have recognized as much.  He knew the officers stopped Northrop based solely on a non-predictive anonymous tip.  Prior to Northrop's trial, the Supreme Court suggested such a tip generally could not support a *Terry* stop. *White*, 496 U.S. at 329.  Indeed, in finding a stop based on a non-predictive anonymous tip unlawful, the Court in *J.L.* applied standards discernable from *White* and other earlier cases.  *J.L.*, 529 U.S. at 270-71.  Finally, because the fruit of the poisonous tree doctrine has long excluded evidence recovered as a result of an unlawful seizure, *Segura*, 468 U.S. at 804; *Wong Sun*, 371 U.S. at 484-85, Braverman had ample notice that the unlawful stop made the cocaine evidence inadmissible.

Attorney Braverman did not file any motion challenging the seizure or questioning of Northrop.  Given the background, it is difficult to imagine what tactical advantage, or cost, could justify Braverman's decision to let the stop go without challenge.  *Strickland*, 466 U.S. at 688 (1984) ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

In finding that Attorney Braverman gave reasonable representation, the dissent relies upon Braverman's testimony that he did not feel Northrop was subject to an involuntary seizure. But as *Terry* explains:

It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime--'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.

392 U.S. at 16.

More important, even if one credits Attorney Braverman's uncertain recollection of his conversation with Northrop, they still do not make his failure to file a motion to challenge

informant only told the police that two black males, one wearing a particular type of name brand clothing, were selling drugs in the Greyhound Bus Station. The tip did not further describe Northrop. Nor did the tip provide any predictive information to allow the officers to assess its reliability. Further, the officers did not observe any suspicious behavior that would have justified the stop independent of the tip.[9]

Accordingly, the officers did not have the reasonable suspicion necessary to stop Northrop under *Terry*. This leads us to decide whether this illegal seizure rendered the cocaine evidence inadmissible. We find that it does.

As noted, the fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible. Here, the officers seized Northrop in violation of the Fourth Amendment. After being illegally seized, Northrop confessed to possessing marijuana. This admission led to Northrop's arrest, which provided the justification for searching the duffel bag. Thus, the officers would not have discovered the cocaine in the duffel bag absent Northrop's illegal seizure. The cocaine was therefore inadmissible as fruit of the poisonous tree.

---

[9] At the *Ginther* hearing, Jackson acknowledged the tip provided the only basis for the stop:

Q.    . . . . The information you received as a result of the radio run was, in effect, two black males suspected of selling narcotics, one dressed in a green Used jean outfit?

A.    Yes.

* * *

Q.    And that's all the information you were operating on?

A.    Yes.

---

Because Northrop was subjected to a *Terry* stop, the question turns to whether Jackson and Collins had a sufficient justification for making such a stop. They did not.

Police officers may initiate an investigatory detention only if they have reasonable suspicion of criminal activity. *Id.* at 21-22. An officer must be able to point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is imminent. Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

Information from an anonymous informant may provide reasonable suspicion to conduct an investigatory detention. *Alabama v. White,* 496 U.S. 325, 326-27, 110 S. Ct. 2412,

---

next to each other?

A.    My partner and I weren't next to each other. We came in through different doors.

Q.    Okay. But you, you came, didn't your partner come over to where this other person [Petitioner Northrop] was?

A.    When I told, when I entered the bus station I asked Mr. Northrop, I'm sorry, I asked the other subject to come to me. My partner, *I believe*, he went to Mr. Northrop.

* * *

Q.    Okay. And did you, when you were talking to this individual, did you see your partner do anything in relationship to Mr. Northrop at all?

A.    I don't remember. I was investigating the subject in the green outfit.

Waiver trial at 18-20, Joint Appendix at 53-55.

110 L. Ed. 2d 301 (1990). However, because any anonymous informant does not bear the responsibility of having to answer for misinformation designed to harass, an anonymous tip must bear some evidence of reliability. Courts assess the reliability of an anonymous tip under the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Typically, courts have found reasonable suspicion for a stop only when the police know the tipster to be reliable or when the tip contains independently verifiable details showing knowledge. *See, e.g.*, *United States v. Taylor,* 162 F.3d 12, 19-20 (1st Cir. 1998) (finding reasonable suspicion to stop suspect's car because tip from known, reliable informant provided specifics as to make and color of car, its registration number, description of occupants, and neighborhood where they were making drug drops); *United States v. Villalobos,* 161 F.3d 285, 290-91 (5th Cir. 1998) (finding reasonable suspicion to stop suspect's vehicle because anonymous tip described, and police corroborated, the vehicle, its point of entry into United States, and its route); *United States v. Harris,* 39 F.3d 1262, 1269 (4th Cir. 1994) (finding reasonable suspicion to stop a driver because reliable informant described suspect and car and correctly predicted future action); *United States v. Walker,* 7 F.3d 26, 31 (2d Cir. 1993) (finding reasonable suspicion to stop individual based on corroborated information from anonymous informant regarding individual's appearance and travel plans).

For example, in *White*, the Supreme Court found an anonymous tip could support an investigatory stop only because the tip contained sufficient predictive information to show its reliability. 496 U.S. at 331. The anonymous informant told police that the defendant would leave a particular apartment at a particular time in a particular vehicle, that she would be going to a particular motel, and that she would be in possession of cocaine. Because the information was corroborated by independent police work, the Court found that, while a "a close case," the anonymous tip, "as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop." *Id*.

In *Florida v. J.L.,* 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000), the Supreme Court found insufficient evidence to create reasonable suspicion necessary for a *Terry* stop under circumstances similar to those presented in this case. An anonymous caller reported to police that a young black male, wearing a plaid shirt, was standing at a particular bus stop and carrying a gun. Officers went to the bus stop and saw three black males. One of the males, J.L., was wearing a plaid shirt. Although the officers did not observe any other evidence that raised suspicion of illegal conduct, one of the officers frisked J.L. and seized a gun from his pocket.

In finding this stop illegal, the Court held an anonymous tip indicating a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. *Id.* at 272. The police officers' suspicion that J.L. had a weapon did not come from their own observations but solely from a call made from an unknown location by an unknown caller. Because it gave no predictive information that would allow the officers to test the informant's knowledge or credibility, the tip lacked sufficient indicia of reliability to provide the reasonable suspicion needed to make a *Terry* stop: "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." *Id.*; *see also United States v. Payne*, 181 F.3d 781, 790 (6th Cir. 1999) ("The tip in this case had none of the indicia of reliability that courts traditionally examine. It was, so far as the record reveals, anonymous. It lacked detail and failed to predict any future events that could be monitored to provide corroboration."); *United States v. Wells*, 223 F.3d 835, 839 (8th Cir. 2000) ("An anonymous tip, however, is insufficient in itself to support a finding of probable cause.").

Here, Jackson and Collins stopped Northrop based solely on a tip from an anonymous source. The officers knew nothing about the informant. And in giving the tip, the