**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Allen GOREE, III, and Naroger Carter,**
**Defendants–Appellants.**

No. 00–5657, 00–5803.

United States Court of Appeals,
Sixth Circuit.

Sept. 12, 2002.

Before KEITH and DAUGHTREY, Circuit Judges, and MARBLEY,* District Judge.

PER CURIAM.

The defendants, Allen Goree and Naroger Carter, appeal their convictions related to possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(b)(1). Defendant Goree raises two issues: (1) that the primary officer involved in his arrest lacked jurisdiction to effectuate that arrest and (2) that the flight information used to locate and ultimately arrest him was used in violation of the Federal Privacy Act, 5 U.S.C. § 552a. Defendant Carter raises three issues on appeal: (1) that the evidence was insufficient to convict him of aiding and abetting, (2) that property seized from his person at the time of arrest was searched in violation of the Fourth Amendment, and (3) that he was sentenced in violation of the Supreme Court holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). For the reasons set out below, we conclude that there is no reversible error in connection with these contentions

---

* The Hon. Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

and affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are largely undisputed. The record reflects on the morning giving rise to the charges against the defendants, Officer Robert Fultz was working on assignment with the airport Drug Enforcement Administration task force at the Cincinnati/ Northern Kentucky airport. His duties included watching flight arrivals for potential drug trafficking. Through the use of an outbound passenger connections list obtained from a Delta Airlines gate agent, along with passenger name records on a United States Customs terminal provided to Delta, Fultz was alerted to several suspect passengers scheduled to arrive on flight 1244 from Phoenix, Arizona, at 6:00 a.m. Fultz focused on two of these passengers, Allen Goree and Naroger Carter, based on several suspicious facts surrounding their presence on the flight: they had purchased sequentially numbered tickets with cash, the tickets were purchased only five hours before the flight's departure, and they were traveling from Phoenix, a known source city, to the ultimate location of Norfolk, Virginia, a know purchase city, with a short flight turn-around.

At approximately 6:00 a.m., Fultz and Fred Painter, an airport police officer and also a member of the DEA task force, observed two men who, according to their later testimony, were acting suspiciously. Once the men exited the jet-way, they appeared "quiet and serious," checking for their connecting gate, gate B–6, while noticeably avoiding a dog handler across the hall at gate B–5. One of the two men, later identified to the agents as defendant Carter, approached the gate agent at gate B–6, while the other man, defendant Goree, proceeded directly to the pay phones located at the gate. Fultz testified that he was certain that the two men were Carter and Goree because they were obviously traveling together and were the only Phoenix passengers scheduled to connect to the flight departing from gate B–6.

Fultz approached Carter and, after identifying himself as a member of the DEA task force and showing his credentials, asked him if they could talk. Carter agreed to speak with Fultz, and in response to the officer's questioning, he denied that he was carrying a large amount of currency or narcotics. After confirming that the individual with whom he was speaking was, in fact, Naroger Carter, Fultz asked for Carter's permission to search his person and baggage. During the consensual search, Fultz recovered a small amount of marijuana from Carter's inside jacket pocket. Fultz issued Carter a state court citation for possession of less than eight ounces of marijuana. He then further questioned Carter concerning the purpose of his trip. Carter stated that he was visiting family and traveling alone. The interaction between Fultz and Carter lasted approximately 20 minutes, after which Carter appeared to scan the terminal as if he were looking for someone, eventually checking his pager and making a phone call.

Upon completion of his conversation with Carter, Fultz and Painter, began to look for Goree. A gate check at B–6 revealed that neither Carter or Goree had boarded the flight to Norfolk. During their search for Goree, Carter approached the officers on two separate occasions, inquiring as to whether they had located "the other person" whom they were looking for. Fultz told him that they had not on both occasions.

The officers proceeded to the cab stand outside the baggage claim area and asked

the attendant if anyone matching Goree's description had recently been spotted. The attendant confirmed that a "really nervous guy" had taken a cab to the Motel 6, producing a taxi stand receipt to confirm the information. The officers left the taxi stand, proceeding briefly to the airport police department and then on to their police vehicle. Fultz and Painter were joined by the two other officers on duty, Mike Bennett and Katherine Felice, and proceeded to the Motel 6.

Upon arriving at the motel, Fultz and Painter went to the front desk to speak with the manager while the other two officers remained in the vehicle. The hotel manager confirmed that a man meeting the description given by the officers had registered with the motel and was in room 234. While in the motel office, the officers spotted Carter emerging from a taxi just outside the motel and heading toward room 234. The officers signaled to Carter that he should join them in the office. Carter entered the lobby, where he was asked to remain with Officer Felice while Officers Fultz, Painter, and Bennett went to Room 234. Sitting with Officer Felice in the lobby, Carter looked through a phone book and asked where the nearest greyhound station was located.

Fultz knocked on the door of room 234 as Painter and Bennett stood out of view from the room's picture window. When the occupant, Goree, opened the door, Fultz identified himself and showed his law enforcement credentials. He asked Goree whether he could speak with him and whether the officers could enter the room. Goree answered, "Sure, come on in," opened the door, and stepped out of the doorway. All three officers entered the room and moved out of the doorway area, allowing Goree access to the doorway.

After the officers confirmed Goree's identity, Fultz explained that he was in-volved in narcotics investigations and that he had noticed Goree that morning at the airport engaging in suspicious activity. Fultz asked if Goree was traveling with anyone, and Goree answered that he was not. He then asked for consent to search Goree, his carry-on bags, and his room. According to the officers' later testimony, Goree consented. Fultz then asked Goree to place his hand on a nearby desk and began a pat-down at Goree's shoulders. When he reached the mid-section of Goree's body, he felt uneven lumps and asked, "What's this?" Goree admitted that the object was cocaine, and Fultz immediately handcuffed him. When Goree's shirt was lifted, the officers saw large amounts of a white powdery substance heavily Saran-wrapped to Goree's upper torso. Officer Bennett then arrested Goree and advised him of his Miranda rights. After Goree's arrest was complete, Officer Painter went to the lobby to assist Officer Felice in placing Carter under arrest.

At the airport police station, four large baggies of cocaine were removed from defendant Goree's body, and Goree gave Officer Painter a written statement explaining his involvement in carrying drugs for Carter. Goree refused to sign a written statement.

Carter was also transported to the police station where Officer Painter searched Carter's personal effects and discovered an electronic address book that had originally been recovered from the pocket of the jacket Carter was wearing at the time of his arrest. Without requesting Carter's consent and without first obtaining a search warrant, Officer Painter opened the organizer, turned it on, and depressed the "scroll" button. An examination of the contents revealed a listing for Goree, Goree's mother, and Goree's pager. Several days later, the officers created a video

record of the contents on the electronic address book.

Carter and Goree were charged in a two-count indictment. The first count charged the defendants with conspiring to posses with the intent to distribute two kilograms of cocaine in violation of 21 U.S.C. § 846. The second count charged them with aiding and abetting each other in the possession of two kilos of cocaine with the intent to distribute it. Both Carter and Goree pleaded not guilty to the charges and went to trial. At trial, the government introduced the videotape of the officers' search of Carter's electronic Rolodex along with testimony identifying the relevant phone numbers, the videotape of the officers removing the cocaine from Goree's body, and the two tickets purchased with cash and printed out at the same time from the same Phoenix, Arizona, location. The officers also testified concerning Carter's behavior on the date of arrest, both at the airport and upon his arrival at the Motel 6.

During trial, the district court dismissed the aiding and abetting charge against Goree. The jury convicted Goree of conspiracy, but was unable to reach a verdict as to Carter, who was later retried and convicted of aiding and abetting Goree. Goree was subsequently sentenced to 63 months' incarceration, while Carter, whose sentence was enhanced by a prior conviction pursuant to 21 U.S.C. § 841(b)(1), received a sentence of 120 months. Both Goree and Carter now appeal their convictions. Carter also appeals his sentence.

*DISCUSSION*

## A. Authority of Officer Painter to Participate in Goree's Detention and Arrest

Goree argues that because Officer Painter had not yet completed DEA task force training at the time that he arrested Goree, he lacked the requisite authority required to make an arrest for a violation of federal law as required by 21 U.S.C. § 878.[1] Therefore, Goree insists, his arrest violated both 21 U.S.C. § 878 as well as the Fourth Amendment ban on unreasonable seizures, and his conviction should be vacated.

■ We find no merit to this argument. Painter was authorized to participate in each stage of the investigation and the arrest as a member of the DEA task force at the Cincinnati/Northern Kentucky Airport. In relevant part, 5 U.S.C. § 3372 provides that:

(a) on request from or with the concurrence of a State or local government, and with the consent of the employee concerned, the head of a Federal agency may arrange for the assignment of-

\* \* \* \* \* \*

(2) an employee of a State or local government to his agency;

for work of mutual concern to his agency and the State or local government that he determines will be beneficial to both.

The statute further provides that "an employee of a State or local government who

1. 21 U.S.C. § § 878 provides, in relevant part:

(a) Any officer or employee of the Drug Enforcement Administration or any State or local law enforcement officer designated by the Attorney General may-

\* \* \* \* \* \*

(3) make arrests without warrant (A) for any offense against the United States

committed in his presence, or (B) for any felony, cognizable under the laws of the United States; if he has probable cause to believe that the person to be arrested has committed or is committing a felony;

\* \* \* \* \* \*

(5) perform such other law enforcement duties as the Attorney General may designate.

is assigned to a Federal agency under an arrangement under this sub-chapter may be deemed on detail to the federal agency." 5 U.S.C. § 3374(a)(2). Pursuant to this authority, the DEA has created numerous drug task forces in areas of concurrent jurisdiction, such as airports and interstates, in an effort to better enforce drug policy. The range of authority available to DEA task force members is detailed in 21 U.S.C. § 878.

Goree does not dispute the fact that Painter had been tapped for participation in the task force and that he was acting in his capacity as a task force member when he was monitoring incoming flights on the morning in question. Rather, he disputes Painter's assignment to task-force work prior to his completion of training and receipt of a drug interdiction certificate. However, Goree fails to produce any authority for the proposition that he advances, that a state officer must complete all federal training or receive an official certificate before he is cloaked with the requisite federal authority. The statute that Goree identifies as the basis for his claim, 21 U.S.C. § 878, imposes no such requirements on its face. Further, as a member of the airport police force, a duty Painter had held for three years at the time of Goree's arrest, Painter had full authority to stop, question, and arrest individuals whom he had probable cause to believe were involved in criminal activity. Given the defendants' illegal conduct in this case, Painter's actions did not violate federal law or constitute an "unreasonable seizure" in violation of the Fourth Amendment.

### B. Use of Customs Information

Goree also claims that his arrest was invalid because it was based upon information unlawfully obtained from an airport computer database of passenger information maintained by the United States Department of Customs. The computer database in question stores information provided to the airline by the passenger at the time an airline reservation is made and when the passenger checks in for the flight, including flight origin and destination, method of payment, time of ticket purchase, and the number of bags checked. Goree argues that this material is protected by the Federal Privacy Act, 5 U.S.C. § 552a, and, accordingly, that use of the information by law enforcement violated the Privacy Act, and the Fourth Amendment as well.

We conclude that this argument has no merit. Title five of the United States Code, "Government Organizations and Employees," includes what is commonly referred to as the Federal Privacy Act. *See* 5 U.S.C. § 552a. The statute provides in relevant part:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

5 U.S.C. § 552a(b). A "record" protected from disclosure by the Act is, in turn, defined as

any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individuals, such as a finger or voice print or a photograph.

5 U.S.C. § 552a(a)(4). Even if the Act were applicable to Goree's claim, an issue we need not now decide, suppression of evidence in a criminal proceeding is not a proper remedy for a violation of 5 U.S.C.

§ 552a. *See* 5 U.S.C. §§ 552a(g)(4) and (i)(1).

██ Nor has the defendant established a viable Fourth Amendment claim in this matter. As the Supreme Court has noted:

[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). All of the information that Goree objects to was provided by him to the airline. Therefore, Goree lacks any "reasonable expectation of privacy" in his flight information. *See, e.g., Guest v. Leis,* 255 F.3d 325, 335–36 (6th Cir.2001). Because Goree has not shown a reasonable expectation of privacy in the information seized, his Fourth Amendment claim fails. *See, e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Accordingly, Goree has failed to establish a right to suppress evidence obtained from information divulged to airline personnel.

### C. Search of Electronic Rolodex

Under the Fourth Amendment, a search absent a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Id.* at 357. One of the delineated exceptions to the warrant requirement is for searches incident to a lawful arrest. *See Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A search incident to arrest may extend to "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763; *see also United States v. Strahan,* 984 F.2d 155, 159 (6th Cir.1993) ("*Chimel* mandates case-by-case evaluation of what constitutes the area within [one's] immediate control.' "). "[W]hile based upon the need to disarm and to discover evidence ... the fact of the lawful arrest ... establishes the authority to search." *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Accordingly, an officer need not provide proof of an additional exigency to justify a search that is incident to a lawful arrest, and the item need not still be in the defendant's immediate control at the time of the search. *Id.; see also, Northrop v. Trippett,* 265 F.3d 372, 379 (6th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1358, 152 L.Ed.2d 354 (2002).

Nevertheless, a search incident to arrest is valid only if the underlying arrest is itself valid. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Carter therefore alleges that at the time of his arrest the police officers lacked probable cause to arrest him. This claim is meritless. The officers, having observed both Carter's behavior at the airport as well as his arrival at the Motel Six where Goree was staying, possessed knowledge of a "probability or substantial chance of criminal activity" on Carter's part. *See United States v. Ogbuh,* 982 F.2d 1000, 1002 (6th Cir.1993); *see also United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (probable cause decision should be evaluated from the reasoned position of a law enforcement officer with their knowledge and expertise). Hence, whether Carter's arrest occurred at the moment he was asked to stay in the hotel lobby or after the police searched Goree, it was supported by probable cause and was therefore a lawful arrest justifying the subsequent warrantless search.

### B. Sufficiency of the Evidence

Evidence is sufficient to sustain a conviction if, when viewed in the light most

favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Carter was convicted of aiding and abetting the crime of possession with the intent to distribute cocaine. Hence, the jury must have found that Carter knew that Goree possessed the cocaine and that he intentionally contributed an act assisting the commission of the possession and distribution of the cocaine. *See United States v. Pena,* 983 F.2d 71, 73 (6th Cir.1993); *United States v. Frazier,* 880 F.2d 878, 886 (6th Cir.1989).

■ The proof established that Goree possessed, with the intent to distribute, almost 2,000 grams of cocaine. Our review of the record convinces us that the verdict in Carter's case is amply supported by the evidence. Carter and Goree possessed identical travel itineraries, with tickets purchased at essentially the same time. Carter was speaking to Goree on the jetway when the flight arrived and signaled Goree as to the position of a drug-sniffing dog. Carter agreed to speak with police officers at the airport, arguably assisting Goree in his successful escape from the airport premises, all the while lying to the officers about his relationship with Goree and the nature of his travel plans. Carter repeatedly asked the officers if they had located "the other guy" as the officers searched the airport. Carter arrived at Goree's hotel and began to approach his door before he was apprehended. Carter possessed Goree's pager number, home phone number, and Goree's mother's phone number in his electronic address book. Based on this body of evidence, a rational jury could have found, beyond a reasonable doubt, that all of Carter's actions were designed to assist Goree in the possession of almost 2,000 grams of cocaine with the intent to distribute.

### C. Carter's Sentence

Carter claims that his 120–month sentence violates the holding in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because although the indictment charged him with aiding and abetting Goree in the possession of two kilos of cocaine, the jury was not instructed to find the amount of cocaine for which he was criminally liable. However, Carter was sentenced under 21 U.S.C. § 841(b)(1)(c), providing the sentence for possession of an undetermined amount of cocaine. The maximum sentence under subsection (c) is far above the sentence imposed on Carter, and, as a result, the holding in *Apprendi* forbidding sentences beyond the statutory maximum without an explicit drug quantity finding by the jury does not apply. Moreover, the Supreme Court has recently held that the imposition of a mandatory minimum sentence below the applicable statutory maximum punishment is likewise not controlled by *Apprendi. See Harris v. United States,* — U.S. —, 122 S.Ct. 2406, 2418, 153 L.Ed.2d 524 (2002).

Carter further claims that his sentence was illegally enhanced by his prior conviction because that conviction was not submitted to the jury in this case. However, enhancements for recidivism do not violate *Apprendi. See* 530 U.S. at 490; *see also United States v. Gatewood,* 230 F.3d 186, 192 (6th Cir.2000) (en banc).

### *CONCLUSION*

For the reasons set out above, we AFFIRM the judgment of the district court as to both defendants in all respects.