UNITED STATES of America,

v.

James W. MASSARO, Defendant.

Criminal No. 07–10169–NMG.

United States District Court,
D. Massachusetts.

June 2, 2008.

Joseph F. Krowski, Jr., Law Offices of Joseph F. Krowski, Brockton, MA, for Defendant.

S. Theodore Merritt, United States Attorney's Office, Boston, MA, for Plaintiff.

## MEMORANDUM & ORDER

GORTON, J.

The defendant James W. Massaro ("Massaro") was indicted on May 22, 2007

for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). On January 31, 2008, he filed five motions to suppress and a motion for a *Franks* hearing. The government has opposed three of those motions.

## I. *Background*

### A. **Factual Background**

At approximately 5:30 a.m. on Saturday, March 24, 2007, a 911 operator at the Lawrence Police Department ("the LPD") received a call on its recorded line. The call was from a woman in an apartment of the Valley Lodge complex, which is approximately three blocks away from the headquarters of the LPD. The Valley Lodge is a transient housing facility and the police regularly respond to reports of domestic disturbances, fights, loitering and drug use at that complex. The female caller on the day in question reported that she had been looking out her window when she heard an altercation, saw a man get out of a parked car and saw him pull out a gun and point it at another man. She reported that the license plate of the parked car was "Massachusetts 146843". She told the operator where she lived and her apartment number before hanging up.

Shortly after that pre-dawn call, Officer William Wolfindale ("Wolfindale"), who was sitting with the operator in the dispatch room, answered a call on the non-recorded police land line. The caller had a Spanish accent and did not identify himself or his location. He told Wolfindale that a man in a green car was waving a gun and that the car was at or near the French Social Club. Neither caller gave any specific description of the man with the gun. The 911 operator shared information from his call with Wolfindale who, as the dispatcher, sent out a police broadcast that there was a green car in the parking lot in front of the social club on Broadway the occupant of which was pointing a gun out the window. Wolfindale also repeated the license plate number reported by the female caller but indicated that he was not sure if it was a Massachusetts or New Hampshire plate.

Sergeant John Dushame ("Dushame") and Officer Thaddeus Czarnecki ("Czarnecki") of the LPD drove to the French Social Club parking lot on Broadway. Dushame's cruiser was very close to the club when he received the broadcast. The officers noticed two cars in the parking lot, neither of which matched the subject license plate number or were warm to the touch. After communicating that information to dispatch, the officers were directed to go to the address of the 911 caller to speak with her. As Dushame proceeded on his way, he noticed a green Volvo parked on the opposite side of the street from the parking lot. He slowed his cruiser, observed that the license plate number of the Volvo was 14GB43 and that the two men in the car looked away from him and slumped down in their seats. The driver of the car had a baseball cap on shielding his face. There were no other cars or people near the green Volvo. The man in the driver's seat was later identified as the defendant, Massaro, and the man in the passenger seat as Jose Valdez ("Valdez").

Dushame radioed dispatch, made a U-turn, pulled up about 15 feet behind the green car and turned on his blue lights. He also activated his cruiser's spotlight and forward flashing "takedown" lights. Both occupants looked back at the cruiser and the driver slouched forward in his seat until Dushame could no longer see him. Within a very short time, five additional police cars surrounded the Volvo and at least six officers were present at the scene. Dushame addressed the occupants of the car over his public address system. Although Dushame had to repeat his orders several times, eventually both occupants,

in turn, got out of the car, approached Dushame's cruiser walking backwards and lay down on the pavement. Officer Czarnecki testified that as the two occupants got out of the Volvo, all responding officers had their guns drawn, some pointed at Massaro and some at Valdez. The two suspects were told that they were being handcuffed for officer safety and after they were handcuffed, the officers reholstered their weapons.

The officers frisked the two suspects who were asked if they had FID cards or licenses to carry a firearm. Massaro replied that he did not. Neither of the suspects had a firearm on his person but when Czarnecki looked inside the Volvo, he saw the black grip of a gun sticking out from under the driver's seat. He retrieved the weapon, which was a fully loaded .22 caliber revolver. After the police found the gun, Massaro and Valdez were placed in the rear seats of separate police cruisers. Valdez told Dushame that the gun was not his and that Massaro "told me the gun wasn't real".

Officer William Hale ("Hale") drove around the corner to speak with the 911 caller. The woman reported that the man with the gun had appeared to be about 5′9″, male and wearing a baseball cap. She said she had witnessed the man in an altercation, pointing the gun and heard him yell: "I'm [expletive] Clint Eastwood". She told Hale that she thought she could identify the man if she saw him again. Shortly thereafter, Officer Eric Cerullo ("Cerullo") drove Massaro to the Valley Lodge apartment building. In Hale's presence, a few feet away from the cruiser in which Massaro was sitting, the woman positively identified Massaro as the man who had been waving the gun. Cerullo then put the baseball cap that Massaro had been wearing back on his head.

After learning about the positive identification, Dushame released Valdez and told him that he was free to go. Massaro was arrested and charged with unauthorized possession of a firearm and ammunition and possession of an open container of alcohol. At his subsequent booking, Massaro was read his *Miranda* rights and made some unsolicited statements, including a recitation of Jack Nicholson's famous utterance about truth from *A Few Good Men.* Massaro was released on bail and later a warrant was issued for his arrest. On March 28, 2007, after he failed to appear at his scheduled arraignment, Massaro was arrested in Chelsea. Apparently, he made statements to the police after that arrest.

On May 25, 2007, after the federal indictment was returned against Massaro, Special Agents Patrick Kelly ("Kelly") and Angelo Thurman ("Thurman") from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") went to Lawrence District Court to take custody of Massaro pursuant to the federal arrest warrant. Massaro was placed in the back of the agents' cruiser next to Thurman who told him that he was under arrest and began to read him his *Miranda* rights. Massaro indicated that he did not need or want to hear them. Thurman, observing that Massaro was agitated, said that he knew Massaro's lawyer had told him not to say anything, to which Massaro nodded his head. The agent asked Massaro a few personal history questions which he answered. Then, without prompting, Massaro asked, "Was it real, has it been tested?" Massaro repeated this question and then said, "f ... in' peashooter." Kelly told him that they would not respond to anything Massaro said without his rights being read to him.

In his memorandum in support of his motion to suppress (but not in an affidavit), Massaro vehemently disputes one important claim of the police. He asserts

that, with respect to the incident on March 24, 2007 ("the March 24 stop"), the police had not received the female's 911 call before he was stopped. At the hearing, Massaro's counsel argued that because dispatch broadcast the suspect's location as the parking lot in front of the French Social Club and that it was unclear whether the vehicle bore a Massachusetts or New Hampshire license plate, the dispatcher must not have had the information from the 911 caller. The Court firmly disagrees.

The 911 operator credibly testified that he received a call from the female before Wolfindale received a call from the unidentified male. Dispatch also broadcast the license plate number reported by the female. Because six digits are not common on Massachusetts license plates, dispatch interpolated the information and reported that the suspect's license plate could be either Massachusetts or New Hampshire. Furthermore, the recorded dispatch contains a conversation in which Wolfindale tells Dushame after Dushame arrived at the social club parking lot that the caller is "in apartment 206 of the Valley Lodging". That part of the dispatch indicates that the police had definitely received the 911 call from the woman before Massaro was stopped.

### B. Procedural History

On May 22, 2007, Massaro was indicted in this case as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On January 31, 2008, Massaro filed five motions to suppress and a motion for a *Franks* hearing. He moves the Court to suppress:

1) statements and evidence obtained during the March 24 stop,

2) evidence obtained during a search of his residence conducted pursuant to a warrant,

3) statements made by him a) after the March 24 stop on that same day, b) during his March 28, 2007, arrest in Chelsea and c) during his May 25, 2007, transfer to federal custody,

4) evidence obtained during an automobile inventory search that occurred on March 25, 2007, at the state police barracks in Danvers, Massachusetts and

5) the "show up" identification that occurred on March 24, 2007.

Finally, Massaro has requested a *Franks* hearing regarding an affidavit filed in support of an application for a warrant to search his residence. On March 14, 2008, the government filed oppositions to three of the six motions, including the motions to suppress listed in subparagraphs 1), 3) and 5) above. The government purports not to contest the other two motions to suppress or the *Franks* motion because it does not plan to introduce evidence obtained from the automobile inventory search or the search of Massaro's residence.

### II. *Motion to Suppress Statement and Evidence Obtained from a Warrantless Automobile Stop (Docket No. 26)*

In his motion to suppress statements and evidence obtained from the March 24 stop, Massaro argues that the stop was illegal both at its inception and in its scope.

### A. The Lawfulness of the Stop at its Inception

#### 1. Legal Standard for a Stop

■ The Fourth Amendment to the United States Constitution guarantees each citizen the right to be free from unreasonable searches and seizures. Police officers may, however, approach citizens and investigate potential criminal activity even without probable cause to make an arrest for the purposes of crime preven-

tion and detection. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer may conduct a brief investigatory stop if he has "reasonable, articulable suspicion that criminal activity is afoot." *United States v. Romain,* 393 F.3d 63, 71 (1st Cir.2004). Reasonable suspicion must be based on specific and articulable facts taken together with the rational inferences to be drawn from those facts. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. The government bears the burden of proving that a vehicle stop without a warrant was justified. *United States v. Monteiro,* 447 F.3d 39, 43 (1st Cir.2006). A court must look at the totality of the circumstances in order to determine the reasonableness of the stop. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ Police officers may rely on information provided by informants in order to establish a reasonable suspicion provided that the information carries sufficient indicia of reliability. *Alabama v. White,* 496 U.S. 325, 328–29, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). An informant's veracity, reliability and basis of knowledge should be assessed to determine the reliability of the tip. *Id.* at 328, 110 S.Ct. 2412. Information gained from known informants carry a greater indicia of reliability than information relayed by anonymous phone tipsters. *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Where informant reliability is lacking, independent police observation may provide the necessary corroboration to create reasonable suspicion. *White,* 496 U.S. at 331–32, 110 S.Ct. 2412.

### 2. Analysis

Massaro argues that his seizure by police was not supported by reasonable suspicion and therefore violated the Fourth Amendment. Dushame seized Massaro in response to a radio dispatch that he heard while on patrol but Massaro contends that the dispatch was based on unreliable information. The anonymous caller allegedly gave no specific details about the person waving the gun except that the man was in a green car near the social club. Massaro also claims that the dispatch was based on the anonymous call only, an assertion the Court dismisses as unsupported by the evidence.

Massaro also discredits the 911 call from the female informant. He argues that:

1) her call was made from a known drug house and that she had not provided information to the police in the past,

2) her information lacked specificity in that she relayed no information about the suspect's appearance, and

3) the police observations did not corroborate the informants' information in that they saw no activity or any green car in the social club parking lot.

When Dushame observed Massaro and Valdez they were lawfully parked (albeit in a green car) on the side of the road, and were not brandishing a firearm, exhibiting any criminally suggestive conduct or making any movements to make Dushame fear for his safety.

■ Due to these circumstances, Massaro contends that this case is controlled by the Supreme Court's decision in *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), in which the Court affirmed the suppression of the introduction of a firearm into evidence. As the government points out, Massaro's reliance on *J.L.* is, however, misplaced. Unlike the situation in *J.L.* in which there was only one anonymous, unrecorded call, here there were two calls, one anonymous and one recorded over the 911 line. The recorded call was from a woman who did not give her name but supplied her address and apartment number. By revealing her location, including the apartment number,

she provided enough information to be held accountable if her allegations turned out to be untrue. *C.f. J.L.*, 529 U.S. at 270, 120 S.Ct. 1375 (contrasting an anonymous tip with a tip from someone who can be held responsible for a fabricated allegation). Although Massaro contends that the woman called from a known drug house, the 911 operator testified that she spoke clearly and provided detailed information. Also, unlike the situation in *J.L.*, she supplied a basis for knowledge. She reported that she had seen a man outside her window pointing a gun. She did not give the 911 operator a detailed description of the armed man but she was able to supply the license plate number of his vehicle. The second, anonymous call corroborated the first call, thereby supporting its reliability.

In addition to the tips he had received via dispatch, Dushame, after he arrived on the scene, corroborated much of the reported information thereby enhancing the informants' credibility. *See White*, 496 U.S. at 331, 110 S.Ct. 2412. Massaro argues that the police did not corroborate the tip because no officer heard gun shots, saw a fleeing victim or observed illegal activity. As noted above Dushame did, however, find a green car with a nearly identical license plate to the one reported within a short distance from the location of the foreboding incident which allegedly occurred at 5:30 a.m.

Considering the totality of the circumstances, the Court concludes that it was reasonable for Wolfindale to relay the information he had just received and for the responding officers to rely on it. Dushame, relying on the information from dispatch (that came from two informants) and his own observations at the scene, had reasonable suspicion to conduct a *Terry*

stop and therefore the stop of Massaro was justified at its inception.

**B. The Scope of the Stop**

**1. Legal Standard with Respect to Scope**

■■■ Even if a stop is initially justified, the scope of the intrusion must be reasonable. *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. There is no precise distinction between an investigatory stop requiring reasonable suspicion and a *de facto* arrest which requires probable cause. *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir. 1998). As with determining the reasonableness of the initial stop, the Court must consider the totality of the circumstances of the restraint in order to determine the reasonableness of the scope. *United States v. Maguire*, 359 F.3d 71, 77–78 (1st Cir.2004). Factors to consider in determining whether a stop becomes a *de facto* arrest include the length of the detention, the restrictions placed on the individuals' personal movement, the force that was exerted, the information conveyed to the detainee and the severity of the intrusion. *United States v. Sowers*, 136 F.3d 24, 28 (1st Cir.1998). Where the stop occurred and whether handcuffs were used are also relevant considerations. *Taylor*, 162 F.3d at 22.

**2. Analysis**

Massaro contends that the scope of his seizure converted the stop into a *de facto* arrest without the requisite probable cause.[1] He emphasizes that Dushame pulled up fifteen feet behind his car in a marked cruiser, activated his blue emergency lights, the spotlight and forward flashing "takedown" lights. Dushame addressed Massaro and Valdez through the

---

1. Massaro has not argued in his initial memorandum or in his reply that the search of the car was outside the scope of the stop and therefore this Court does not address that issue.

cruiser's public address speaker which can be heard from a block away. At least six police officers in multiple police vehicles surrounded Massaro and drew their service revolvers. Massaro and Valdez were ordered first to show their hands, then to get out of the car and finally to lie on the ground where they were handcuffed and pat frisked.

Massaro argues that many of the factors the First Circuit described in *Taylor* as indicative of a *de facto* arrest were present in Massaro's case but the Court found in that case that a stop very similar to Massaro's was not an arrest. 162 F.3d at 21–22. In *Taylor*, an informant had reported to police that two men in an Acura were in possession of a large quantity of crack cocaine and two hand guns. During the seizure of the suspects, their car was blocked by police vehicles, there were 10–12 officers on the scene, at least two officers drew their weapons, the suspects were placed face down on the ground and pat frisked and the detention lasted approximately 30 minutes. *Id.* at 21. Unlike this case, the suspects in *Taylor* were not handcuffed although they were secured. Massaro also asserts that the information the police relied on in *Taylor* was more reliable, contained more details and created greater suspicion than the information the LPD had in Massaro's case.

The First Circuit has made clear that the use of handcuffs does not automatically convert an investigatory stop into a *de facto* arrest. *United States v. Acosta–Colon*, 157 F.3d 9, 18 (1st Cir.1998). Using handcuffs is, however, one of the most recognizable indicia of a traditional arrest. *Id.* In order to demonstrate that the use of handcuffs was reasonable, the government must point to specific facts that support a reasonable belief that such a restraint was necessary to carry out the stop without exposing the officers and the public to undue risk of harm. *Id.* at 18–19.

■ In this case, there was sufficient information to support the belief of the police officers that one of the two men in the green Volvo was armed and had been brandishing a gun. The car Massaro occupied closely matched the earlier description of the subject car. Dushame also testified that when he shined the cruiser's spotlight on the car, he saw the driver of the car slump down in the seat until he was out of sight. Massaro failed to comply with the officer's instruction promptly, which heightened suspicion. The police officers had no idea where the gun was and consequently the use of handcuffs was warranted to ensure the safety of the officers and the public.

Massaro contends that the officers' inquiry as to whether he had an FID card indicates that he was under arrest. The purpose of a *Terry* stop is, however, to allow law enforcement to investigate potential criminal activity. Asking a person suspected of carrying a gun whether that person is lawfully entitled to possess a gun falls easily within the lawful scope of a *Terry* stop.

The government points to other factors which demonstrate that the stop was not a *de facto* arrest. For example, an officer told Massaro that he was being handcuffed for officer safety, the stop lasted only about 15 minutes, the police acted promptly to confirm that Massaro was the suspect and, although there was very little traffic, the encounter occurred on a public street. *See Taylor*, 162 F.3d at 21–22.

The Court concludes, from the totality of the circumstances, that the scope of the stop was reasonable and therefore did not constitute a *de facto* arrest. Because the stop was justified at its inception and reasonable in its scope, the statements and evidence obtained from it will not be suppressed.

### III. *Motion to Suppress Statements (Docket No. 34)*

In his motion to suppress statements, Massaro argues that the statements he made at the March 24 stop, on March 28, 2007 (when he was arrested in Chelsea, Massachusetts) and on May 25, 2007 (when he was arrested and transported by ATF agents) should be suppressed as obtained in violation of *Miranda* or, alternatively, as involuntary.

### A. The *Miranda* warnings

#### 1. Legal Standard

The prosecution may not use statements from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to preserve the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To trigger the constitutional protections of *Miranda*, there must be a custodial interrogation of the defendant. *Id.* As a general rule, *Terry* stops do not implicate the requirements of *Miranda* unless the detainees are subject to restraints comparable to a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir.1986). A police officer involved in a Terry stop may ask the detainee some questions to determine his identity and to obtain information to confirm or dispel the officer's suspicions. *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138.

#### 2. Analysis

Massaro argues that his *Miranda* rights were violated only with respect to his statements during the March 24 stop. Although it is unclear which statements he contests (i.e., those made during the encounter on the street or those made at the booking), Massaro focuses his argument primarily on the street encounter. That encounter has been found to have been a valid *Terry* stop but if, during the incident, Massaro was subject to restraints comparable to a formal arrest, he was in custody and therefore was entitled to be informed of his *Miranda* rights before being interrogated. *See Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138. The First Circuit Court of Appeals has found that, even during a lawful *Terry* stop, the restraint of a suspect can amount to a formal arrest. *United States v. Quinn*, 815 F.2d 153 (1st Cir.1987); *United States v. Brito–Melo*, 2006 WL 2559860, at *7 (D.Mass. Sept. 5, 2006). At least four other Circuit Courts have held that a lawful *Terry* stop may include restraints equivalent to a custodial situation requiring *Miranda* warnings. *See United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir.2007); *United States v. Martinez*, 462 F.3d 903, 909–10 (8th Cir. 2006); *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir.2004)(citing the Tenth Circuit approvingly); *United States v. Smith*, 3 F.3d 1088, 1096–97 (7th Cir.1993).

At the time he was asked whether he had an FID card or a license to carry a firearm, Massaro was handcuffed, lying face down on the pavement and under the scrutiny of several police officers whose weapons had just been trained on him. Under those circumstances, although the scope of the *Terry* stop was reasonable, Massaro was subject to restraints comparable to arrest and therefore was in custody for the purpose of the *Miranda* analysis. That particular interrogation was conducted in violation of the defendant's *Miranda* rights, and consequently, his responses to those questions will be suppressed.

It is unclear whether Massaro seeks to suppress the statements he made at his booking. Nevertheless, the booking officer testified credibly that after he read Massaro his *Miranda* rights and told him

the charges against him, Massaro made several spontaneous statements including the Jack Nicholson impersonation. Because Massaro had been advised of his *Miranda* rights and because his statements were uttered spontaneously, the statements made at the booking will not be suppressed as having been obtained in violation of *Miranda.*

### B. The Voluntariness of Massaro's Statements

#### 1. Legal Standard for Voluntariness

 The Due Process Clause prohibits compelled confessions. *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The voluntariness of an admission depends on whether the will of the defendant was overborne so that the statement was not a free and voluntary act. *Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971). In making that assessment, the totality of the surrounding circumstances must be evaluated, including the characteristics of the accused and the details of the interrogation. *Id.* Before a confession can be found to have been involuntary, there must be a finding that the police invoked coercive police practices. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The government bears the burden of establishing voluntariness by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

#### 2. Analysis

 Massaro has neither alleged nor offered any evidence to suggest that the police did anything coercive that overbore his will. He contends that he was frustrated and in a "confused, anxious state" when he was arrested on March 28, 2007. Such allegations, even if true, do not allege police misconduct and therefore do not support a claim of involuntariness. It is also clear that, although Thurman

asked Massaro for biographical information during his transferral to federal custody on May 25, 2007, nothing about the conversation was overbearing or in violation of Massaro's rights. Consequently, Massaro's statements will not be suppressed as involuntary.

### IV. Motion to Suppress an Impermissibly Suggestive Identification (Docket No. 40)

Massaro contends, in his third motion to suppress, that the circumstances of the female 911 caller's identification of him was impermissibly suggestive and unreliable and therefore must be suppressed.

### A. Legal Standard

 The Fifth Amendment requires that a witness's pre-trial identification be excluded from evidence in cases where the identification procedures employed are so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to denial of due process of law. *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). An identification will be excluded if 1) the procedure employed was impermissibly suggestive and 2) notwithstanding the suggestive procedure, the identification was not reliable under the totality of the circumstances. *United States v. de Jesus–Rios,* 990 F.2d 672, 677 (1st Cir.1993). A Court should consider five factors in determining reliability: 1) the opportunity of the witness to view the criminal at the time of the crime, 2) the witness's degree of attention, 3) the accuracy of the witness's prior description of the criminal, 4) the level of certainty demonstrated by the witness at the confrontation and 5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *de Jesus–Rios,* 990 F.2d at 677.

## B. Analysis

### 1. Identification Procedures

Massaro argues that the identification procedures were impermissibly suggestive because 1) the police performed a so called "show-up" identification, 2) Valdez was not presented to the witness, 3) Massaro was transported in the back of a police cruiser to the witness's residence and 4) a police officer placed a hat on Massaro's head.

Show-up identification procedures are strongly disfavored by courts. *de Jesus–Rios*, 990 F.2d at 677. As the government points out, however, the First Circuit has held that show-ups that take place immediately after the offense has been committed may be necessary in order to avoid apprehending the wrong person. *United States v. Watson*, 76 F.3d 4, 6–7 (1st Cir.1996). The identification of Massaro was just such an identification. The officers took Massaro to the female informant in order to confirm that they had apprehended the right person.

With respect to Massaro's remaining arguments, first, the government persuasively notes that Valdez was not presented to the witness because the loaded weapon was found under Massaro's seat and Valdez had already credibly informed the police that the gun was not his and that Massaro had told him the gun was not real. Second, because the show-up occurred within 20 minutes of the incident which the female caller had witnessed, the identification was not impermissibly suggestive despite Massaro's condition. *See United States v. Lebron–Cepeda*, 324 F.3d 52, 58 (1st Cir.2003). Third, Hale credibly testified that the witness identified Massaro before the hat was placed on his head, rendering moot any argument that the hat had an effect on the identification.

The facts and the law indicate that the identification was not impermissibly suggestive and therefore the show-up identification will not be suppressed.

### 2. Reliability of the Identification

In assessing the reliability of an identification, the Court must evaluate the following five factors:

#### a. Witness's Opportunity to Observe

Although Massaro argues that the female caller made her observations through a window from across the street in the dusk of early morning, Hale testified that the parking lot where the witness had seen Massaro was well lit. In fact, the witness was able to see the license plate number of the car from her vantage point. Because she observed Massaro from the safety of her apartment, the witness was able to look at him without fear of drawing attention to herself.

#### b. Witness's Degree of Attention

The commotion outside and the witness's decision to call the police suggest that the witness paid close attention to the man with the gun because of his behavior.

#### c. Accuracy of Prior Description

Massaro points out that the witness did not give identifying information about the individual with the gun during the 911 call or when Officer Hale first went to speak with her. She said the man was 5′9″ and wearing a hat. She did not describe his clothes, ethnicity, race, facial features, physique, hair color or facial hair. The witness did, however, give a fairly accurate description of Massaro's car and license plate number.

#### d. Certainty of Identity

The witness observed the face of the suspect and made a positive identification without hesitation.

#### e. Length of Time Between Crime and Confrontation

The evidence indicates that the identification was made very shortly after the subject incident. Such a contemporaneous identification readily supports reliability.

*See Velez v. Schmer,* 724 F.2d 249, 252 (1st Cir.1984).

◼ Considering all of the factors together, even if the procedure used in the identification were impermissibly suggestive, the identification was reliable. Consequently, this Court will deny Massaro's Motion to Suppress an Impermissibly Suggestive Identification.

## ORDER

In accordance with the foregoing, defendant's

1) Motion to Suppress Evidence Obtained from 564B Lowell Street, Peabody, MA Pursuant to an Invalid Search Warrant (Docket No. 31) and Motion to Suppress Evidence Obtained from an Unlawful Inventory Search (Docket No. 37) are **ALLOWED** as unopposed;

2) Motion for *Franks* Hearing (Docket No. 29) is **DENIED** as moot;

3) Motion to Suppress Statements and Evidence Obtained from a Warrantless Automobile Stop (Docket No. 26) and Motion to Suppress an Impermissibly Suggestive ID (Docket No. 40) are **DENIED** and

4) Motion to Suppress Statements (Docket No. 34) is, to the extent it seeks to suppress Massaro's response to the officers' questions with respect to having an FID card or license to carry a firearm, **ALLOWED** but is otherwise **DENIED.**

**So ordered.**